# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### 1:17-cv-932

KIMBERLY CASH, DANNY CASH, GRETTA )
ELLER, EMILY CASH, TESS STRYK, )
KATE JENKINS-SULLIVAN, LAURA ADAIR, )
ALLISON HEWITT, NINA TROY, and TARYN )
MCFADDEN, individually, and CAITLYN )
COUNCILMAN, SOMMER FANNEY, DARBY )
KOZAN, KATHERINE HOLT, MARIELLA )
COSCIA, and OLIVIA WINDER, individually and )
on behalf of all those similarly situated; )
)
            Plaintiffs, )
)    **COMPLAINT -- CLASS ACTION**
v. )
)
GUILFORD COLLEGE AND THOMAS )
PALOMBO, in his individual and official capacity, )
)
            Defendants. )
)

Plaintiff CAITLYN COUNCILMAN is a female student and former varsity athlete,

Plaintiffs SOMMER FANNEY, DARBY KOZAN, KATHERINE HOLT, and MARIELLA

COSCIA are female students and varsity athletes, and OLIVIA WINDER is a female student and

club athlete ("Student Plaintiffs") at Defendant GUILFORD COLLEGE ("GC" or "Defendant").

The Student Plaintiffs each file this action individually for all damages and on behalf of a class

of all other similarly-situated females for injunctive and declaratory relief only.

Plaintiffs GRETTA ELLER, EMILY CASH, TESS STRYK, KATE JENKINS-

SULLIVAN, LAURA ADAIR, ALLISON HEWITT, NINA TROY, AND TARYN

MCFADDEN are female former students and varsity and club athletes ("FORMER STUDENT

PLAINTIFFS") at GC and file this action individually.

1

Plaintiffs KIMBERLY CASH ("Coach Kimberly") and DANNY CASH ("Coach Danny") were head coaches of women's varsity teams at GC and file this action individually. THOMAS PALOMBO ("AD Palombo") is the former Athletic Director and current Men's Basketball Coach at GC.

Plaintiffs allege the following upon personal knowledge as to their own acts and upon information and belief as to all other matters as follows:

## STATEMENT OF THE CASE

1.      The Student Plaintiffs file claims in this case as a class action on behalf of themselves and on behalf of a class of current, prospective, and future female students at GC who participate, seek to participate, and/or are or were deterred from participating in athletics at GC, on behalf of females who are deterred from enrolling at GC because it does not offer the sport in which they want to participate, and on behalf of current, prospective, and future female student-athletes who are denied, will be denied or have been denied equal treatment and benefits in athletics at GC.

2.      Defendant discriminates on the basis of sex by, among other things, providing male students with a greater opportunity to participate in varsity and club intercollegiate athletics than it provides to female students and providing superior treatment and benefits to male athletes than female athletes.  This sex discrimination violates Title IX of the Education Amendments of 1972 (20 U.S.C. §1681 *et seq.*) and the regulations adopted pursuant thereto (34 C.F.R. Part 106) (collectively, "Title IX").

3. The Student Plaintiffs file claims to stop Defendant from discriminating against them and all others similarly situated. They seek to prevent Defendant from discriminating against them based on their gender by providing unequal opportunity to participate in varsity intercollegiate athletics and unequal treatment and benefits to women athletes than men athletes, to require Defendant to add women's varsity athletic opportunities until Defendant offers male and female students an equal opportunity to participate in varsity athletics and to provide equal benefits and treatment to women athletes.

4. Defendant discriminated against the Former Student Plaintiffs on the basis of sex by, among other things, providing male students with a greater opportunity to participate in varsity intercollegiate and club athletics and providing superior treatment and benefits to male athletes than it provided to them. Former Student Plaintiffs file claims to require Defendants to redress the past discrimination and unlawful conduct against them, including compensating them for lost educational and employment opportunities, emotional pain and suffering, and economic damages.

5. Defendant has discriminated and continues to discriminate against Coach Kimberly in the terms and conditions of her employment because of the sex of the student athletes she coached and her sex. Defendant failed to provide Coach Kimberly with the personnel and resources necessary to properly run the women's T&F XC program, and subjected her to a hostile environment and adverse work actions preventing her from being as successful as she could be with the proper support similar to that provided to coaches of men's teams, thus limiting her career prospects.

3

6.     Defendant retaliated against Coach Kimberly in the terms and conditions of her employment because she complained about the unequal treatment and requested equal treatment of female athletes and coaches of female athletes at GC, by, among other things, subjecting her to a hostile and abusive environment in her work at GC, failing to increase her pay as promised, demoting her, constructively discharging her, and taking other adverse work actions.

7.     Defendant has discriminated and continues to discriminate against Coach Danny in the terms and conditions of his employment because of the sex of the student athletes he coaches. Defendant failed to provide Coaches Danny with the personnel and resources necessary to properly run the women's T&F XC program and has subjected him to a hostile environment and adverse work actions preventing him from being as successful as he could be with proper support similar to that provided to coaches of men's teams, thus limiting his career prospects.

8.     Defendant has retaliated and continues to retaliate against Coach Danny in the terms and conditions of his employment because he complained about the unequal treatment and requested equal treatment of female athletes and coaches of female athletes at GC, by, among other things, subjecting him to a hostile environment, removing him as the head coach of women's T&F XC programs, forcing him to perform coaching and other duties outside his job description, giving him unwarranted negative performance evaluations, mismanaging and manipulating his pay, paying him in a manner GC knew would cause his resignation under  a pretext of an increase in pay, and taking other adverse work actions.

9.     Coach Danny files this action to stop Defendant's from discriminating against him because he coached female athletes, including subjecting him to a hostile environment and adverse work conditions, and to require GC to redress the past discrimination, including restoring Coach Danny to coaching the women's T&F XC teams and paying Coach Danny for his work

4

equal to others at GC, paying lost wages, and compensating him for emotional pain and suffering and economic damages.

10.   Coach Kimberly files this action to require Defendant's to redress the past discrimination and unlawful conduct against her, including paying her lost wages and compensating her for emotional pain and suffering and economic damages.

## JURISDICTION AND VENUE

11.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4) because Plaintiffs' legal claims arises under 20 U.S.C. §1681, *et seq* and its interpreting regulations.

12.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a) because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

13.   Jurisdiction for declaratory and other relief is invoked pursuant to 28 U.S.C. §§2201 and 2202.

14.   Venue is proper pursuant to 28 U.S.C. § 1391(b).  These claims arose in Greensboro, North Carolina, which is within the jurisdiction of this court.

## THE PARTIES

15.   Plaintiff Kimberly Cash was the co-head coach of women's and men's T&F XC teams at GC from 2012-2016.  Plaintiff resides in Hurdle Mills, North Carolina, which is within the jurisdiction of this court.

16.   Plaintiff Danny Cash is the head coach of men's T&F XC teams at GC and the former co-head coach of the men's and women's T&F XC teams.  Plaintiff resides in Hurdle Mills, North Carolina, which is within the jurisdiction of this court.

5

17.     Plaintiff Caitlyn Councilman is a female student in her senior year at Defendant GC. Plaintiff was a member of the GC women's varsity T&F XC team from 2014 through 2016. During the school year, Plaintiff resides in Greensboro, North Carolina, which is within the jurisdiction of this court.

18.     Plaintiff Sommer Fanney is a female student in her senior year at Defendant GC. Plaintiff is a member of the GC women's varsity T&F XC team and has been since 2014. During the school year Plaintiff resides in Greensboro, North Carolina, which is within the jurisdiction of this court.

19.     Plaintiff Darby Kozan is a female student in her senior year at Defendant GC. Plaintiff is a member of the GC women's varsity softball team and has been since 2014.   During the school year Plaintiff resides in Greensboro, North Carolina, which is within the jurisdiction of this court.

20.     Plaintiff Katherine Holt is a female student in her junior year at Defendant GC. Plaintiff is a member of the GC women's varsity softball team and has been since 2015.   During the school year Plaintiff resides in Greensboro, North Carolina, which is within the jurisdiction of this court.

21.     Plaintiff Mariella Coscia is a female student in her junior year at Defendant GC. Plaintiff is a member of the GC women's softball team and has been since 2015.   During the school year Plaintiff resides in Greensboro, North Carolina, which is within the jurisdiction of this court.

22.     Plaintiff Olivia Winder is a female student in her junior year at GC.  Plaintiff is a member of the GC women's club rugby team and has been since 2015.  During the school year Plaintiff resides in Greensboro, North Carolina, which is within the jurisdiction of this court.

6

23.     Plaintiff Gretta Eller is a former female student-athlete at GC, who graduated in December 2014.  Plaintiff was a member of the GC women's varsity T&F XC team.    During all relevant times, Plaintiff resided in Greensboro, North Carolina, which is within the jurisdiction of this court.

24.     Plaintiff Emily Cash is a former female student-athlete at GC, who graduated in May 2015.  Plaintiff was a member of the GC women's varsity T&F XC team.    During all relevant times, Plaintiff resided in Greensboro, North Carolina, which is within the jurisdiction of this court.

25.     Plaintiff Tess Stryk is a former female student-athlete at GC, who graduated in May 2016.  Plaintiff was a member of the GC women's varsity T&F XC and soccer teams. During all relevant times, Plaintiff resided in Greensboro, North Carolina, which is within the jurisdiction of this court.

26.     Plaintiff Kate Jenkins-Sullivan is a former female student-athlete at GC, who graduated in May 2017.  Plaintiff was a member of the GC women's varsity T&F XC team. During all relevant times, Plaintiff resided in Greensboro, North Carolina, which is within the jurisdiction of this court.

27.     Plaintiff Laura Adair is a former female student-athlete at GC, who graduated in May 2017.  Plaintiff was a member of the GC women's varsity T&F XC team.    During all relevant times, Plaintiff resided in Greensboro, North Carolina, which is within the jurisdiction of this court.

28.     Plaintiff Allison Hewitt is a former female student-athlete at GC, who graduated in May 2015.  Plaintiff was a member of the GC women's varsity tennis team.    During all

7

relevant times, Plaintiff resided in Greensboro, North Carolina, which is within the jurisdiction of this court.

29.     Plaintiff Nina Troy is a former female student-athlete at GC, who graduated in May 2016.  Plaintiff was a member of the GC women's varsity swim team.  During all relevant times, Plaintiff resided in Greensboro, North Carolina, which is within the jurisdiction of this court.

30.     Plaintiff Taryn McFadden is a former female student-athlete at GC, who graduated in May 2017.  Plaintiff was a member of the GC women's club rugby team. During all relevant times, Plaintiff resided in Greensboro, North Carolina, which is within the jurisdiction of this court.

31.     Defendant GC is a private university of higher education located in Greensboro, North Carolina, which is within the jurisdiction of this court.

32.     GC receives federal financial assistance and the benefits therefrom.  Therefore, all programs at GC, including intercollegiate athletics, are subject to the requirements of Title IX.

33.     Defendant Palombo was the Athletic Director at GC from at least 2009 through August 2017.  Defendant Palombo is the head coach of men's basketball at GC and has been since at least 2009 through present,  and he resides in Greensboro, North Carolina, which is within the jurisdiction of this court.

## CLASS ALLEGATIONS

34.     The named Student Plaintiffs bring the first and third claims on behalf of themselves and, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all those similarly situated.  In particular, the Student Plaintiffs seek to represent a class of all present, prospective, and future female students at GC who participate, seek to participate

8

and/or are or were deterred from participating in athletics at GC and who are denied, will be denied or have been denied equal treatment and benefits.

35.     Each of the named Student Plaintiffs is a member of the proposed class and has been or will be injured by Defendant's sex discrimination, failure to provide female students with an equal opportunity to participate in varsity intercollegiate athletics at GC and failure to provide equal treatment and benefits to female athletes.

36.     The class is so numerous that joinder of all class members is impracticable.

37.     The proposed class is known to exist but the identity of its members is and will continue to be fluid and unidentifiable during the course of this litigation because of the nature of college enrollment and athletic participation.  In particular, GC is a college with a student body whose members graduate after approximately four years from matriculation. Its varsity student athletes are allowed only four years of athletic eligibility under the rules of the National Collegiate Athletic Association ("NCAA").  Accordingly, the members of the class harmed by Defendant's discriminatory actions constantly change as each class of students graduates and as another class of incoming students enrolls at GC and graduating high school students apply for consideration for enrollment at GC.

38.     The class includes prospective and future students who will enroll at GC during the course of this litigation or who will be deterred from enrolling at GC because of Defendant's failure to provide equal athletic participation opportunities to female students and equal treatment and benefits to female athletes.

39.     The class also includes not just T&F XC athletes and softball and rugby players, but also all present, prospective, and future female students who want to participate in a varsity intercollegiate sport not offered at GC, such as field hockey, golf, rugby, equestrian, cheer,

9

triathlon, sand volleyball and other sports, and those who want equal treatment and benefits provided to GC female athletes.

40.     GC has never surveyed its present or prospective student body to assess their athletic interests and abilities.  Moreover, because GC recruits high school students to apply to and enroll at Defendant for the purpose of participating in varsity intercollegiate athletics, GC could increase and thus equalize athletic participation opportunities for female students by starting virtually any new varsity sports team and then recruiting athletes to enroll and participate.

41.     The hundreds of additional class members who would apply to GC, who would be recruited by GC coaches to attend GC, and who would participate in athletics at GC but for GC's failure to add the more than 170 athletic spots necessary to reach equal opportunity are too numerous to make joinder practicable.

42.     The Student Plaintiffs satisfy the "commonality" requirement of Fed.R.Civ.P. 23(a)(2), because they share questions of law and fact in common with the proposed class, particularly whether GC's policies and practices violate Title IX by failing to provide female students with an equal opportunity to participate in intercollegiate athletics, and failing to provide female athletes at GC equal treatment and benefits in comparison to male athletes. Because Title IX athletics claims require comparison of the sex-segregated men's and women's athletic opportunities as a whole, the issues are inherently class-based.

43.     The Student Plaintiffs satisfy the "typicality" requirement of Fed.R.Civ.P. 23(a)(3), because their claims are typical of those of the proposed class.  The sex discrimination which the Student Plaintiffs have suffered, including (a) unequal treatment and benefits in GC's athletics program and (b) exclusion from opportunities to participate in GC's athletics program

10

are typical of the sex discrimination which members of the Class have suffered, are suffering, and, unless this Court grants relief, will continue to suffer. All want the Court to require GC to add more women's sports and athletic opportunities and to provide equal treatment and benefits to female athletes at GC.

44.     The Student Plaintiffs will fairly and adequately represent the interests of the class pursuant to Fed.R.Civ.P. 23(a)(4) as each applied to, was accepted by and is a current female student at GC and each is subjected to discriminatory and unequal opportunities, treatment, and benefits that Defendant provides and/or fails to provide to female students and female athletes. They intend to prosecute this action vigorously to secure fair and adequate remedies, including injunctive relief, for the entire class.

45.     The undersigned class counsel are experienced in complex litigation and federal civil rights litigation, especially under Title IX, and will fairly and adequately represent the interests of the class in this action.

46.     The Student Plaintiffs satisfy the class certification requirements of Fed.R.Civ.P. 23(b)(2), because Defendant has acted or refused to act on grounds generally applicable to the class - denying female students an equal opportunity to participate in intercollegiate athletics and equal treatment and benefits in athletics- thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

## **GENERAL ALLEGATIONS**

## **THE REQUIREMENTS OF TITLE IX**

47.     Title IX, enacted in 1972, provides in relevant part:

11

> No person in the United States shall, on the basis of sex, be
>
> excluded from participation in, be denied the benefits of, or be
>
> subjected to discrimination under any education program or
>
> activity receiving Federal financial assistance . . .

20 U.S.C. § 1681(a). The Civil Rights Restoration Act of 1987 made plain Congress' intent that the terms "program or activity," as used in Title IX, mean any program or activity so long as any part of the public institution receives federal financial assistance. 20 U.S.C. §1687. Thus, Defendant is subject to Title IX even if none of the funding for either its men's or women's athletic program comes from federal sources, if it otherwise receives federal assistance.

48.     In 1975, the Department of Health, Education and Welfare ("HEW" - the predecessor of the United States Department of Education ("DOE")) adopted regulations interpreting Title IX. These regulations (the "Regulations") are codified at 34 C.F.R. Part 106. (The DOE regulations adopting the HEW regulations are at 45 C.F.R. Part 86.) The Regulations are enforced by the Office for Civil Rights ("OCR") within DOE.

49.     With regard to athletic programs, 34 C.F.R. § 106.41(a) provides that intercollegiate and club athletics are included within the "program or activity" requirements of Title IX:

> No person shall, on the basis of sex, be excluded from participation in, be
>
> denied the benefits of, be treated differently from another person or
>
> otherwise be discriminated against in any interscholastic, intercollegiate,
>
> club or intramural athletics offered by a recipient, and no recipient shall
>
> provide any such athletics separately on such basis.

50.     34 C.F.R. § 106.41(c) specifies ten (10) non-exclusive factors that may be considered in the determination of equal athletic opportunity:

1.     Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

2.     The provision of equipment and supplies;

3.     Scheduling of games and practice time;

4.     Travel and per diem allowance;

5.     Opportunity to receive coaching and academic tutoring;

6.     Assignment and compensation of coaches and tutors;

7.     Provision of locker rooms, practice and competitive facilities;

8.     Provision of medical and training services;

9.     Provision of housing and dining facilities and services; and

10.     Publicity.

Other factors to be considered are a school's "failure to provide necessary funds for teams for one sex" and recruiting.

51.     In 1979, OCR issued a policy interpretation of Title IX and the Regulations as applied to intercollegiate athletics.  This policy interpretation is found at 44 Federal Register 71,413 (1979) (the "Policy Interpretation").

52.     The Policy Interpretation provides that, in order to comply with Title IX and 34 C.F.R. § 106.41(c), schools must provide equal athletic opportunities in three general areas: (1) equal athletic participation opportunities (34 C.F.R. §106.41(c)(1)); (2) equal treatment and benefits to those with participation opportunities (34 C.F.R. §106.41(c)(2)-(9)); and (3)equal

13

athletic financial assistance (34 C.F.R. §106.37). At the present time, only the first and second prong-- equal athletic participation opportunities and equal treatment and benefits -- are at issue in this case.

53.     According to the Policy Interpretation, compliance in the area of the first prong of equal athletic participation opportunities is determined under the following three-part test:

1)  whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments;

2)  where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

3)  where the members of one sex are under-represented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*See* 44 Fed. Reg. 71,418.

54.     This three-part test was further clarified after notice and comment in OCR's 1996 Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the "1996 OCR Clarification"), making clear that "participation opportunities must be real, not illusory."

55.     The Regulations require that sponsors of intercollegiate athletics (such as Defendant) take such remedial actions as are necessary to overcome the effects of sex

14

discrimination in violation of Title IX. *See* 34 C.F.R. §106.3(a). Defendant has not taken any recent remedial actions to satisfy its obligations under Title IX. Nor has Defendant ever provided females with an equal opportunity to participate in varsity athletics or provided equal treatment and benefits to its female athletes, and any remedial actions which Defendant has taken in the past years have been insufficient to satisfy Defendant's obligations under Title IX.

56. The Regulations also require that federal fund recipients like Defendant adopt nondiscrimination policies and grievance procedures, appoint and train Title IX officers to receive and investigate sex discrimination complaints, and disseminate this information to all students, faculty, and employees. 34 C.F.R. §§106.8 & 106.9. The Regulations further require that recipients promise and confirm compliance by filing an Assurance of Compliance with DOE each time they apply for or receive federal financial assistance. 34 C.F.R. §106.4.

57. The Regulations further require that sponsors of interscholastic athletics comply with the athletics regulations within three years of their effective date (which was July 21, 1975). Defendant did not comply with the athletic regulations by the 1978 compliance deadline or at any time thereafter. Now, more than 40 years later, Defendant still does not fully comply with Title IX.

58. The Title IX Regulations expressly prohibit employment discrimination in educational programs. 34 C.F.R. §106.51 et seq (Subpart E). Section 106.51(a)(1) states that,

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment . . . under any education program or activity operated by a recipient which receives or benefits from Federal financial assistance.

15

59.     Section 106.51(a)(3) states: "A recipient shall not enter into any contractual or other relationship which directly or indirectly has the effect of subjecting employees or students to discrimination."

60.     Title IX's prohibition of discrimination on the basis of sex covers, among other things: compensation, job assignments, fringe benefits, and any other term, condition, or privilege of employment.  34 C.F.R. §106.51(b).  Title IX prohibits sex discrimination in employment based upon the sex of the employee and based upon the sex of the students taught or athletes coached.

## FACTUAL ALLEGATIONS

61.     As set forth above, a school's provision of equal treatment and benefits to those with participation opportunities is assessed based on an overall comparison of the male and female student athletic programs.

62.     Defendant has unlawfully discriminated against female student athletes in violation of Title IX with respect to athletic treatment and benefits in many areas including but not limited to: (1) provision of equipment and supplies; (2) scheduling of games and practice times; (3) travel and per diem allowance; (4) opportunity to receive coaching and academic tutoring (5) assignment and compensation of coaches; (6) provision of locker rooms, practice and competition facilities; (7) Provision of medical and training facilities and services; (8) Provision of housing and dining facilities and services; (9) funding and fundraising opportunities; (10) publicity; (11) recruiting; and (12) support services. 34 C.F.R. §106.41(c); 44 Fed.Reg. 71,416.

### Provision of Equipment and Supplies

63.     Defendant provides more and superior equipment and supplies to male student athletes as compared to female student athletes, including uniforms, sport specific equipment,

16

general equipment, and conditioning and weight-training equipment, as shown in the following examples.

64.    GC provides male athletes with higher quality and more uniforms than its female athletes.  For example, the women's swim team is required to purchase goggles, swim caps, and swimsuits that meet competition requirements in order to compete.  GC provides mismatched swimsuits and t-shirts of varying sizes for the team's use during practice that are left over from previous years.  The members purchase their own matching GC swimming t-shirts for meets to represent GC with dignity.  No men's team is required to purchase necessary equipment. Members of the swim team have asked GC to provide competition swimsuits and t-shirts.  GC has not done so.  Men's tennis is afforded their preferred choice of stylish uniforms, while the women's tennis players have no choice and are given out of style uniforms.   Men's T&F have almost double the numbers of uniforms available to them than the women's T&F team. The softball team is provided fewer number and choices of uniforms than baseball.

65.    GC provides male athletes with higher quality and more game equipment than its female athletes.   For example, women's tennis players are given inferior rackets and balls that are left over from the men's team's unwanted equipment.  Men's basketball and baseball are provided more uniforms and equipment, such as footwear and helmets, than women's basketball and softball teams.

66.    GC provides male athletes with greater access to GC's laundry loop – a service GC provides to wash and fold soiled athletic wear after practice. Almost all male athletes use the GC laundry loop but very few, if any, female athletes use the service.  Women's teams have requested this service but have been told by GC that women's teams budgets cannot afford the laundry loops.

67.     GC's weight room is equipped with weights, supplies, and equipment designed for use by male student athletes, including heavy weights with no available lighter weights, and machines and equipment designed for heavier weights and larger athletes, which limits use by female student athletes.

Provision of Locker Rooms, Practice and Competition Facilities

68.     GC provides male athletes with higher quality and more locker-rooms and practice and competition facilities that are better maintained than those it provides to female athletes.

*Practice and Competition Facilities*

69.     The GC Athletic Complex Center ("ACC") includes the Armfield Athletic Center (where football, and men's and women's lacrosse and soccer practice and play games), Edgar H. McBane Field and Stuart T. Maynard Batting Center (where the men's baseball team practices and plays game), Ragan-Brown Field House (where men's and women's basketball and volleyball practice and compete), Jack Jensen Golf Center (where the men's golf team practices), and Alumni gym, which houses coaches' offices, athletic training facilities, an ancillary basketball practice court, the strength and conditioning facility and athletic administration offices. The GC ACC is a central location located in the heart of GC campus, making it easily accessible to athletes, students, and spectators and close to academic classes. Student athletes using the ACC are in close proximity to locker rooms, athletic training, strength and conditioning facilities, and coaches' offices and overall attention to their sport.

70.     More male student athletes practice and compete at this centrally located premier location than female athletes. Based on the numbers in EADA 2015-16 report, 82.2% of the GC male athletes practice and compete at the ACC in contrast to only 40.6% of the GC female

athletes. While 17.8% of the male athletes practice and competition facilities are not located near the ACC (T&F XC, and tennis), 59.9% of the female athletes are not (T&F XC, softball, swimming and tennis).

71.     The Armfield Athletic Center where 57.4% of male student athletes and 24.5% of female student athletes practice and compete (where football, and men's and women's lacrosse and soccer practice and play games), has been continually improved over the past decade undergoing a $2.5 million renovation, including renovations of a new press box adding a state-of-the art scoreboard, sound system, and extensive lighting system, new visitor bleacher seating and field lights, exterior improvements with a new entry plaza and gate at the north end of the stadium, and the installation of an expanded turf field.

72.     The GC men's baseball program field complex (Edgar H. McBane Field) is in the ACC and adjacent to Alumni Gym. The field has been continually improved and has permanent dugouts for home and visiting teams, a new padded backstop, new bleacher seating for spectators, a new state-of-the-art inning-by-inning scoreboard, a brick dust warning track and a new eight-foot vinyl coated fence and windscreen. In October 2008, GC made exterior improvements including a new entry plaza and terraced seating behind the backstop.  GC continued improvements to the McBane Field in 2016, when it completed an elaborate wooden wall surrounding McBane Field, redid the infield, built a new seating facility with stadium seating and pavilion style concourse, and provided new benches for the home dugout and new helmet and bat racks. The Stuart T. Maynard Batting Center adjacent to the McBane field was built in April 2010, and includes a "team/recruit room," which is available 24 hours a day and has lights.

73.     In contrast, GC's softball team plays and practices on Haworth Field, located on the northwest corner of GC more than a quarter of a mile away and a 15-20-minute walk, from the ACC, where female athletes are farther from their classes, coaches, medical services, locker rooms and weight training, and is not as accessible to students and spectators.  The softball field was built in 2003 and the only improvement since was adding a scoreboard.  The field does not drain well and the grass is patchy and not well-maintained.   Softball players have no storage available for their equipment and keep the equipment in their dorm rooms and carry it to practice and games more than a quarter mile from central campus.

74.     Defendant does not provide any hitting facility for the softball team.  Although GC advises that the baseball team should share their "state of the art facility" with softball, the softball players have limited use, and any use is impractical due to the differences in the sport requirements, such as pitching mounds, and its distance from the softball field.

75.     GC designates men's golf and women's swimming as comparable sports for Title IX purposes but GC provides better quality practice and game facilities to golf than swimming. In 2010, GC began plans for the Jack Jensen Golf Center and completed it in 2014.  This state-of-the-art practice facility is in the ACC and contains indoor and covered practice areas, with an adjacent driving range for the GC varsity golf team, as well as meeting and locker room space.

76.     In 2009, GC closed its only pool, which was in the ACC and where the women's varsity swim team had practiced and competed. It was replaced with the current strength and conditioning room. Since 2009, the women's swim team has been required to practice three miles away off-campus at an average high school pool.  GC female swimmers are required to find their own transportation to practices and some meets or be driven in vans to their competitions.

20

77.     Both men's and women's basketball practice in the Ragan-Brown Field House gymnasium. If there is a scheduling conflict, the men's team is given priority and the women's team practice in the inferior Alumni gymnasium.

*Locker Rooms*

78.     During their seasons, all men's teams (100% of male athletes) have exclusive access to a locker room designated only for use by that team.

79.     In contrast, Defendant provides only women's basketball and volleyball (16.1% of female athletes) with exclusive access to a locker room designated only for use by that team for most of their seasons (although they share the locker room for a few weeks of overlap between seasons).

80.     GC has 5 locker rooms for male athletes and 1 for female athletes in the ACC that are designated for exclusive use for specific GC male and female teams. The male locker rooms all are more spacious (double the size), better equipped (bigger lockers, two have televisions, etc.) with more storage than the women's locker room.  During their seasons, other than basketball and volleyball, female athletes share the use of locker rooms with other GC women's teams, visiting teams (male and female) and game officials (male and female), and/or coaches (male and female).  Due to this, female athletes' locker room assignments change during their season depending on the needs of GC. For example, women's T&F XC is assigned to a visitor's locker room, where visiting teams, coaches and officials have priority use. T&F XC coaches are often informed last-minute or not at all that visitors will be using their team's locker room, at which point the T&F team does not have access to that locker room, with players having no notice and no place to change or shower.

81.    Golf has its own locker room in its facility in the ACC while the swim team has no locker room or storage space, although they are permitted to use the high school locker room to change in at practice.

82.    Softball and women's tennis-- about 37 athletes-- must share one small crowded locker room, while men's tennis has exclusive use of the same size locker room but which is more spacious because there are only 11 athletes and 11 lockers. Before 2015, softball did not have access to a locker room near its facility.  Baseball has its own exclusive locker room in the ACC and a team room for its exclusive use.

*Strength and Conditioning Facility*

83.    Males have priority access in scheduling, prime time and number of hours in the strength and conditioning weight room, which is in the ACC and closer to more male athletes' locker-rooms, practice and competition facilities than female athletes.

Scheduling of Games and Practice Times

84.    Defendant provides more and better practice and game opportunities to its male compared to its female student athletes.

85.    GC provides male athletes with a greater number of practice opportunities and better times for practices than its female athletes.  For example, T&F and swim teams practice at a remote high school location, three miles from campus.  GC T&F and swim each have limited access to their practice facilities at the high school due to priority given to the high school's own events and schedule. GC has no access when the high school is closed, having exams, practicing emergency drills, hosting home games for its other athletics teams, such as soccer, or has rented its facility to other high school teams. Due to collegiate requirements and conflicts with high school facilities, the GC T&F and swim programs cannot host any competitions, so GC T&F and

22

swim must travel to all meets. The high school rents their swim facility at peak times, which limits availability to the GC swim team leaving only very early morning practice or late-night practice slots open for GC athletes.

86. Men's teams are given more prime time game and competition slots. For example, football has priority for prime times for games. In addition, when there is a conflict in scheduling games in a facility, men's teams are given priority.

<u>Equal access to coaching and coaches' compensation</u>

87. GC provides male athletes with greater access to coaching providing female athletes with fewer numbers of, and less experienced and more overburdened, coaches than male athletes.

88. Specifically, GC provides more full-time coaches and more assistant coaches to its male athletes than female athletes. For example, as reported on the 2015-16 EADA report, there are 10 assistant coaches for female athletes (1 is full-time and 9 are part-time), while there are 19 assistant coaches for male athletes (5 are full-time and 14 are part-time).

89. GC provides coaches of male athletes more and better resources and benefits than coaches of female athletes, attracting better and more qualified coaches of males as follows.

90. As reported on the 2015-16 EADA report, GC pays its head coaches of men's teams an average annual salary of $45,692 while it pays it head coaches of women's teams an average annual salary of $30,010. In 2015-16, GC paid its head coaches of men's teams in total $365,536.00 as compared to the head coaches of women's teams in total $240,080.00.

91. As reported on the 2015-16 EADA report, GC pays its assistant coaches of

23

men's teams an average annual salary of $15,337.00 while it pays it assistant coaches of women's teams an average annual salary of $7,536.00. In 2015-16, GC paid its assistant coaches of men's teams in total $230,055.00 as compared to the assistant coaches of women's teams, which it paid $67,824.0) in total.

92.     GC provides a locker room for male coaches with individual lockers for year-round exclusive use, showers, bathrooms, and storage.  GC does not provide a locker room for female coaches.   Female coaches of women's teams have complained to GC about the lack of a locker room for them since 2011 and through the present.

93.     GC provides more and better office space to coaches of men's teams than women's teams.  For example, all head coaches of men's teams have their own office, and men's golf has two, which are superior to offices for women's head coaches. For example, in 2016-2017, the head coaches of women's T&F XC and swimming had no office.

94.     Assistant coaches of men's basketball, men's lacrosse and men's baseball have their own office and assistant coaches of football have their own office complex with at least three offices for assistants.  GC provides only one office for an assistant coach of a women's teams, which is basketball. This is only because the head coach of women's basketball, Stefanie Flamini, is provided an office for her duties as the senior women's athletics administrator, and Coach Flamini uses only that office leaving the office designated for the head coach of women's basketball for use by her assistant.

95.     GC extends more and better sport camp opportunities to coaches of men's teams than to coaches of women's teams, which is a source of personal income and funding for their teams that GC does not include in salary and budgets numbers reported on the EADA report.

24

96.     Coaches of men's teams have greater access to on-campus housing than coaches of women's teams.  For example, GC provides the head coach of football with his own on-campus house and assistant football coaches have housing options and priority of housing options over coaches of women's teams. GC gives preference to football assistant coaches to be GC dormitory managers, which includes a free or reduced-rent apartment.

97.     GC hires coaches for female athletes that have less experience in coaching in comparison to the coaches of its male athletes. For example, in summer 2016, GC removed one of the head coaches for women's T&F XC when it forced Coach Kimberly to leave her position as co-head coach and refused to replace her, leaving the team with only half the available coaches for three months.  In November 2016, GC removed the only remaining head coach of women's T&F XC team, Coach Danny, and left the team without a head coach through March 2017, causing disruption and the team to cancel their first and critical meet. GC did not replace the only assistant coach for women's T&F XC when he resigned in November 2016 due to the poor treatment of the T&F XC programs. GC filled the empty position of head coach of women's T&F XC spot mid-season in March 2017 with a coach who had no collegiate head coaching experience and who was less qualified that Coach Kimberly or Coach Danny, causing disruption and the team to cancel another meet. GC did not provide proper training or the necessary resources for the new head coach to successfully run the women's T&F program and she resigned in August 2017.   GC then hired a new head coach for women's T&F XC teams in August 2017, who had no cross-country or head coaching experience and was less qualified that Coach Kimberly or Coach Danny.

98.     Coaches of men's teams are closer and have greater access to administrative support, including access to the athletic director and secretarial and clerical support and are

25

less burdened overall in the exercise of their coaching duties due to the greater preference and support in all areas given to coaches of male athletes than to coaches of female athletes. For example, coaches of women's teams are required to perform all administrative duties, including completing paperwork and providing documentation for all expenditures, while this is done by the athletic secretary for coaches for football and men's basketball. AD Palombo, who is also the men's basketball head coach, treats female coaches dismissively, does not take them or their teams' needs seriously and spends much less time with them than male coaches.

Provision of Medical and Training Services and Facilities

99.     GC provides female student-athletes inferior medical and training services and less access to such facilities in comparison to their male counterparts.

100.     In 2011, GC approved and built a new athletic training/medical room located in the ACC that includes a private entrance into the medical facility for football and men's basketball players and coaches from those teams' locker rooms.

101.     GC provides more athletic trainers ("ATs") for male athletes than female athletes for practices and games. ATs always attend practices and home games for men's lacrosse and basketball and football (more than one AT). Women's basketball and volleyball are the only women's teams for which ATs attend all home games and practices. Except for women's basketball, lesser qualified trainers are assigned to women's teams if assigned at all. Many times, there is no AT at softball practices and never at swim practices, which are both far from the ACC and medical facility. If ATs are available, they travel with men's teams to away games, and men's teams have priority over women's teams for access to an AT. Except for women's basketball, it is rare for an AT to travel with a women's team to away games.

26

102.    GC provides male athletes greater access to and better medical care than female athletes.  For example, in the common training room, male athletes are treated and cared for first before female athletes.  ATs spend more time with, and provide superior treatment to, male athletes.  Female athletes do not have equal access to medical supplies, such as ice and treatment modalities and equipment. The Head AT has openly refused to work with female athletes and made disparaging comments, such as "you are not real athletes." Complaints have been made to the athletic administration about this the unequal treatment every year with no meaningful action taken.

Funding and Fundraising Opportunities

103.    Defendant fails to provide female athletes with equitable funding and fundraising opportunities as compared to male athletes.

104.    Men's sports are given priority for field and facility usage to run clinics or camps to raise money for their programs. In addition, more female athletes and coaches of women's teams cannot fundraise because their facilities are inferior and unsuitable.   For example, the McBane field is a state-of-the-art facility in high demand, which the baseball team easily rents and raises money for its program's use.  The softball facility is inferior and there is little demand to rent it, depriving the women's team of the same opportunity to fundraise and access to additional money for its program.

105.    More female athletes and coaches of women's teams cannot fundraise because they have no facility or place to host events.  GC has no pool for the GC swim team so it cannot host fundraising events. Further, to be able to use the high school's pool for practice, GC requires the GC women's swim team coaches and team members to assist the high school in running its high school competitions.  Similarly, for GC T&F to use the high

27

school's track for its practices, GC requires GC's T&F coaches and team members to host and run high school XC competitions at the GC XC course (GC's XC course only meets requirements for high school but not collegiate competition), and GC deducts costs for those materials from the GC T&F XC budget.

106. In 2011, the GC T&F XC program was approved for funding from the Belk Foundation for almost the entire cost of a state-of-the-art collegiate track and field facility. GC refused this funding opportunity.

107. Significantly more women's teams' players and coaches than men's teams are required to fundraise for necessary funding, without which their programs would not be able to compete. For example, softball is required to fundraise to have essential game equipment and basic practice gear, unlike baseball.

108. The Quaker Club is GC's athletic booster club, which is geared toward fundraising and financial support for men's teams and mostly football and basketball. Monies raised are primarily for use by the men's football and basketball programs and are not reported as revenue on, or used to offset, those teams' budgets or tracked. On multiple occasions from 2011 through 2016, AD Palombo, VP John Varnell, and VP Athletics Todd Clark informed the coaching staff that private donations of money or gifts in kind slated for the use of a specific team did not count against that team's budget or for reporting for Title IX equity. This is GC's generally accepted practice and policy. Coaches informed GC that practice was in violation of Title IX on numerous occasions. AD Palombo often told the women's teams' coaches that the men's teams had more because they received more money from donations.

109. In addition to failing to provide necessary funds for some women's teams, GC

28

budgets and spends significantly less overall for women's sports than for men's sports. For example, per the 2015-16 EADA report, GC reports a budget of (1) $41,000.00 for men's teams and $13,613.00 for women's teams for Recruiting expenses; (2) $669,772.00 for men's teams and $213,985.00 for women's teams for Operating Game Day expenses, with each men's team except T&F XC individually budgeted for a higher amount than each comparable women's team; and (3) $1,358,127.00 for men's teams and $630,591.00 for women's teams for Total Expenses.

110.     In addition, GC underreports the EADA numbers for men's expenditures and overreports for women's expenditures and manipulates numbers to make it appear that GC spends more on women's teams than it does.   For example, in 2015, GC administration used money budgeted for the T&F XC fringe benefits line item for football without informing T&F XC coaches or accounting for it.

<u>Travel and per diem</u>

111.     Defendant does not provide female students with equitable travel benefits in comparison to their male counterparts. GC provides higher quality lodging, meals and transportation for away competitions for male athletes than female athletes. Softball is not provided with the same per diem as baseball, and is housed in inferior lodging and eats at lower quality restaurants, and many times parents must feed the team a meal on away games. Women's swim team members are required to purchase their own breakfast for early morning meets and do not have adequate lodging at away meets, often having four to six swimmers share a hotel room and beds.

<u>Publicity and Support</u>

112.     GC fails to provide female athletes with equitable publicity and marketing compared to male athletes. The GC sports information office and GC's marketing efforts are

29

focused on the teams housed at the ACC (which is 82.2% of the GC male athletes and only 40.6% of the GC female athletes), and mostly to football and men's basketball. For example, the men's teams have better websites with more detail and more frequent updates, and more and better press releases and media coverage. Football, baseball, and men's basketball, soccer and lacrosse have live-streaming of their games and simultaneous radio play-by-play coverage, while it is rare for any women's teams to receive such coverage. GC promotes men's teams' competitions more than women's teams' in the press and with more and superior advertisements and signage.

113.     GC provides greater photographic coverage of male teams and athletes than female athletes and teams. For example, GC instructs many of its women's teams to take their own team pictures. All men's teams' pictures are taken by GC.

<u>Significantly Different Game Day Experience</u>

114.     In addition to having superior practice and competition facilities and greater proximity to central campus for significantly more male athletes than female athletes, the Armfield Athletic Center is better equipped to accommodate fans, with more seating, as well as a press box and sound system, and clean, sanitary, and usable bathrooms for both the players and fans than any other competition facility used by female athletes. In addition, the GC cheer team cheers at football games and no women's competitions.

115.     The GC athletic administration gives preferential treatment to men's teams overall by more frequently attending men's competitions, deciding any conflicts in the favor of male athletes, and treating its male athletes and male coaches with more dignity and respect than its female athletes and coaches. For example, AD Palumbo is dismissive of female athletes' concerns and of female coaches, frequently referring to

30

women coaches in stereotypical and demeaning terms such as "honey" and refusing to take their concerns seriously as he does for male coaches.

116.    GC also provides a club rugby team for men and women but has failed to provide equal treatment and benefits to the women's rugby club team.  For example, men's rugby has twice the budget as the women's team and more and better qualified coaches and officials, and is given priority over field use and practice and game times than the women's rugby team.

## FIRST CLAIM FOR RELIEF:  TITLE IX-GC

(Sex-Based Discrimination in Athletic Treatment and Benefits)

(on behalf of Student Plaintiffs and the Proposed Class)

117.    The Student Plaintiffs brings this claim as a class action as set forth in the Class Allegations.

118.    Student Plaintiff Caitlyn Councilman is and was provided unequal treatment and benefits as a member of the women's T&F XC teams and has dropped out in T&F XC in her senior year due to GC's discriminatory treatment of her as a female athlete.

119.    Student Plaintiff Sommer Fanney is and was provided unequal treatment and benefits as a member of the women's T&F XC teams and is currently participating in T&F XC.

120.    Student Plaintiffs Darby Kozan, Katherine Holt, and Mariella Coscia are and were provided unequal treatment and benefits as member of the women's softball team and are currently participating in softball.

121.    Student Plaintiff Olivia Winder is and was provided unequal treatment and benefits as a member of the women's club rugby team and is currently participating in club rugby.

31

122.    GC is on notice that it provides and has provided for many years unequal treatment and benefits to female student-athletes.  Between 2011 and the present, GC coaches and team members have repeatedly complained about the unequal treatment and benefits of all female athletes at GC, provided reports and videos illustrating the disparate treatment, officially and unofficially asked GC to remedy the unequal treatment and benefits, and have informed Defendant that its actions constitute violations of Plaintiffs' and the Class's Title IX rights. Defendant has failed to remedy or address the violations.

123.    As a proximate result of Defendant's discriminatory actions, Student Plaintiffs and the Class have been denied their civil right to pursue an equal opportunity to participate in varsity and club intercollegiate athletics and, as such, have been denied the educational, economic, physical, psychological, and social benefits of athletic participation. They have suffered or imminently will suffer irreparable harm and damages associated with, among other things, lost opportunities, loss of future educational and employment opportunities, emotional distress, lost self-esteem, humiliation, and the denial of equal opportunity because of sex.

124.    Student Plaintiffs and the Class are entitled to relief, including declaratory and injunctive relief, compensatory damages, attorneys' fees, and costs.

## SECOND CLAIM FOR RELIEF:  TITLE IX-GC

(Sex-Based Discrimination in Athletic Treatment and Benefits)

(on behalf of Former Student Plaintiffs)

125.    Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 124 of this complaint.

32

126.     Former Student Plaintiffs Gretta Eller, Emily Cash, Tess Stryk, Kate Jenkins-Sullivan, and Laura Adair were provided unequal treatment and benefits as members of the women's varsity T&F XC teams at GC.

127.     Former Student Plaintiff Tess Stryk were provided unequal treatment and benefits as a member of the women's varsity soccer team at GC.

128.     Former Student Plaintiff Allison Hewitt were provided unequal treatment and benefits as a member of the women's varsity tennis team at GC.

129.     Former Student Plaintiff Nina Troy were provided unequal treatment and benefits as a member of the women's varsity swim team at GC

130.     Former Student Plaintiff Taryn McFadden were provided unequal treatment and benefits as a member of the women's club rugby team at GC.

131.     As a result of Defendant's discriminatory actions, the Former Students have been denied their civil right to pursue an equal opportunity to participate in varsity intercollegiate athletics and, as such, have been denied the educational, economic, physical, psychological, and social benefits of athletic participation.  They have suffered or imminently will suffer economic and compensatory damages associated with, among other things, lost opportunities, loss of future educational and employment opportunities, emotional distress, lost self-esteem, humiliation, and the denial of equal opportunity because of sex.

132.     Former Student Plaintiffs are entitled to relief, including compensatory damages, attorneys' fees, and costs.

## THIRD CLAIM FOR RELIEF:  TITLE IX-GC

### (Unequal Athletic Participation Opportunities)

(on behalf of Student Plaintiffs and the Proposed Class)

133.    Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 132 of this complaint.

134.    Defendant has, by its conduct, discriminated against female students at GC, including Plaintiffs, by failing to provide female students an equal opportunity to participate in varsity intercollegiate athletics in violation of Title IX and 34 C.F.R. §106.41(c)(1).

135.    Student Plaintiffs bring this claim as a class action as set forth in the Class Allegations.

136.    By offering certain opportunities to male students to participate in intercollegiate athletics, Defendant has demonstrated its belief that athletic opportunities provide educational benefits that should be supported by GC.  Athletic opportunities provide valuable educational benefits.  For this very reason, the Student Plaintiffs - and the class they represent - should have equal access and opportunity to receive the benefits that the male students at GC receive from intercollegiate athletics.  GC historically has not provided and currently does not provide its female students with such equal access and opportunity.

137.    Defendant determines the number of athletic participation opportunities that it will provide to male and female students by choosing which sports it will offer to and support for each sex and by deciding how many athletes it will allow to participate on each sport team.

138.    GC sponsors a broad varsity intercollegiate athletic program.  It sponsors sports and teams for both men and women specifically classifying certain men's and women's sport as "comparable sports" at GC for the purposes of complying with Title IX. The sports include

34

men's baseball and women's softball (comparable), men's and women's basketball (comparable), men's and women's cross country (comparable), men's football and women's volleyball (comparable), men's golf and women's swimming (comparable), men's and women's lacrosse (comparable), men's and women's soccer (comparable), men's and women's tennis (comparable), men's and women's outdoor track and field (comparable), and men's and women's indoor track and field (comparable). In choosing which sports to offer to which sex of students, GC chooses how many varsity athletic participation opportunities to provide to male students and how many athletic participation opportunities to provide to female students.

139.    GC is a member of the NCAA and participates in Division III.  As such, GC does not offer athletic scholarships to members of its varsity athletic teams. GC is a member of the Old Dominion Athletic Conference ("ODAC"), which sponsors the ten women's sports that GC offers, plus three other women's sports: field hockey, golf and equestrian.

140.    Like other Division III schools, GC recruits high school students to apply to and to enroll at GC for the purpose of participating in GC's varsity athletic teams.

141.    Defendant fails to comply with each prong of the three-part test set forth in paragraph 53.

First Prong:    GC Fails to Provide Substantially Proportionate Athletic Participation Opportunities to Female Students

142.    Defendant has discriminated, and continues to discriminate, against female students at GC by failing to provide them with equal athletic participation opportunities, despite female students' demonstrated athletic interests and abilities to participate in sports.

35

143.    Defendant fails and has failed to provide female students with varsity athletic participation opportunities in a number substantially proportionate to female undergraduate enrollment.

144.    Based on the information provided by Defendant to the federal government in its most recent 2016 Annual Equity in Athletics Disclosure Act ("EADA"), in 2015-2016, GC's undergraduate student body is slightly more than 50% female.  Female athletes, however, make up only slightly more than 30% of the total number of GC athletes.  This leaves more than a 20% gap between the number of athletic participation opportunities GC provides for women and the number of participation opportunities that would be needed to be substantially proportionate to GC's undergraduate enrollment for females.  To achieve athletic participation opportunities for female students that are substantially proportionate to their representation in GC student body, GC would need to add approximately 177 additional female athletes, which would constitute numerous additional female teams.

145.    Defendant manipulates its roster sizes to cause lower numbers than the actual number of male athletic participants and higher numbers than the actual number of female athletic participants to be reported to DOE for its EADA report. For example, men's teams carry less athletes on the day GC counts its numbers for EADA and officially add more participants after that date.  In addition to roster manipulation, Defendant underreports to EADA actual male participation and overreports actual female participation in varsity athletics, including failing to report male junior varsity ("j.v.") team participants or players that practice but do not compete.

146.    Further, GC counts XC, Indoor T&F and Outdoor T&F as separate sports for purposes of Title IX and triple counts male and female athletes that participate in those three sports even though they are substantially the same athletes on each team.  For example, if twenty

36

female athletes participate on the XC team and the same twenty women are also on the indoor and outdoor T&F teams, although only twenty female students are participating in athletics, GC counts this as 60 female students. As shown above, GC offers significantly more overall athletic opportunities for male students than female students. Accordingly, the triple counting disproportionately inflates the percentage of female athlete participation opportunities.

147.     This failure to provide women with substantially proportionate genuine participation opportunities, despite their interests and abilities to participate, has occurred without justification or defense by Defendant.

148.     Plaintiffs are informed and believe, and based thereon allege, that the ratio of female to male athletes at GC is not substantially proportionate to the overall ratio of enrolled female to male students at GC.

Prong Two:     Defendant Does Not Have a History or Continuing Practice of Program Expansion in Response to the Developing Interests and Abilities of Female Students.

149.     Further, with respect to the test's second part, Defendant cannot show "a history and continuing practice of program expansion that is demonstrably responsive to the developing interest and abilities" of GC's female students. The historical trend is entirely the opposite.

150.     GC, despite significant participation gaps between the student population percentage and the athletic opportunities for female GC students, has continued to add more athletic opportunities for males than females, since at least 2009. For example, as reported in the EADA report in the 2009-2010 school year, GC provided 290 athletic opportunities for male athletes and only provided 163 athletic opportunities for female athletes. In the latest EADA report in 2015-2016 school year, GC provided 326 athletic opportunities for male

37

athletes and only provided 155 athletic opportunities for female athletes; adding 36 athletic opportunities for males while taking away 8 athletic opportunities for females since 2009-2010.

151.    In addition, GC has provided and continues to provide better treatment and more benefits to men's than to women's athletic programs. For example, GC has added more assistant coaches for men's teams compared to coaches for women's teams. Since 2010-2011, GC has added a full-time assistant coach position for men's sports and has removed two full-time assistant coach positions for women's sports.

152.    GC has added and continues to add new facilities for male athletic programs since 2009 and has added no new facilities for women. For example, GC took away its pool for women's varsity swimming and replaced it with the 10,000-square foot Ragsdale Fitness Area, which benefits more male than female athletes, forcing the women's swim team to practice and compete off-campus at an inferior high school facility.

153.    Further, while a significant disparity continues to exist between total expenditures for men and women's athletics over the past 5 years (with men's teams budgeted for more than twice as much as budgeted for women's teams in 2015-2016), GC has increased and continues to increase total expenses for male athletic teams more than for female, spending about $131,637.00 more for men's teams in 2015-2016 than in 2010-2011, while spending only $35,521 more for women's teams in 2015-2016 than in 2010-2011.

  <u>Prong Three</u>:  <u>GC Has Failed to Fully and Effectively Accommodate the Athletic Interests and Abilities of Its Female Students</u>

154.    Defendant has not adequately expanded the athletics program in a manner responsive to female students' interests and abilities. GC female students have the abilities to

participate in varsity athletics and are interested in participating in varsity athletics in greater numbers, which they have consistently demonstrated to GC.

155.    GC has repeatedly been put on notice of female students' abilities and interests in additional women's athletic opportunities. Although it avoided surveying that interest by failing to survey its present or prospective student body to assess its athletic interests and abilities, GC did survey its student athletes in 2012, but never reported findings. That survey showed that GC was not effectively meeting the interests of current student athletes. GC was also on notice of student interest because coaches and students requested it add certain varsity sports, as shown in the following examples:

- **Rugby**- In 2013-14, GC female club rugby team members asked GC to support a varsity rugby team to accommodate student interest. GC declined. Rugby has been a GC club sport since 2007 and averages between 17-25 players each year. The NCAA has classified women's rugby as an emerging sport since 2002, which status permits it to be counted by schools for gender equity and Title IX requirements. Rugby is the only full contact sport sponsored by the NCAA for women; while football and men's lacrosse are NCAA full contact sports for men and provided by GC.

- **Field Hockey**- There have been numerous requests to GC for a women's field hockey team over the years. For example, in 2014, the GC women's lacrosse coach and players presented a petition to GC to support a varsity field hockey team to accommodate student interests and assist the women's lacrosse coach with recruiting and retention of lacrosse players. GC declined. Field hockey is an NCAA and ODAC-sponsored sport with 8 ODAC schools carrying varsity women's field hockey teams. GC had a varsity field hockey program in the 1970s.

39

- **Sand Volleyball**- In 2014, the GC women's volleyball coach officially requested GC to support a sand volleyball team to accommodate student interests and assist the coach with recruiting and retention of volleyball players. GC declined.  Sand volleyball is an NCAA-sponsored sport.

- **Golf-** In 2012-13, the GC women's tennis players asked GC to support a women's golf team to accommodate student interests and assist the coach with recruiting and retention of tennis players. GC declined.  Women's golf is an NCAA and ODAC-sponsored sport, with 7 ODAC schools carrying varsity women's golf.

- **J.V. Basketball**- In 2015-16, the women's basketball coach requested a j.v. team to support a women's basketball team to accommodate student interests and assist the coach with recruiting and retention of basketball players.  GC declined.

- **Equestrian**- In 2013, GC female students asked GC to support an equestrian team to accommodate student interests.  GC declined.  Equestrian is an NCAA emerging sport and an ODAC-sponsored sport with 6 ODAC schools carrying varsity women's equestrian teams and one a club team.

- **Cheer-** In 2013, GC female cheer club team members asked GC to support a varsity cheer team to accommodate student interest and to regain its former status as a varsity sport from 2007-2012. GC declined.   In 2016, the International Olympic Committee recognized cheerleading as a sport and granted the International Cheer Union provisional recognition as the governing body of cheerleading. Cheer is seeking NCAA emerging sport status, with at least 2 ODAC schools carrying varsity women's cheer.

- **Triathlon**- In 2015, the GC women's T&F XC coaches asked GC to support a varsity women's triathlon team to accommodate student interests and assist the women's T&F XC coaches coach with recruiting and retention of T&F XC coaches and players. GC declined. Triathlon is an NCAA-sponsored sport.

156.    Student Plaintiff Caitlyn Councilman was a member of her high school equestrian team and has the ability and interest to participate on a women's varsity **equestrian** team.

157.    Student Plaintiff Darby Kozan was a member of her high school field hockey team and has the ability and interest to participate on a women's varsity **field hockey** team.

158.    Student Plaintiff Olivia Winder is a current member of the women's rugby club and has the ability and interest to participate in women's varsity rugby.

159.    GC provides funding and support for more participation opportunities per team for male athletes than female athletes. GC provides participation opportunities for men's teams well above the NCAA minimum squad size, while most women's teams are only at or slightly above the NCAA minimum. For example, GC provides participation opportunities at or below the NCAA minimum for the women's swim team. In 2014-15, GC reported a roster size of 11 for women's swim, when there were only 8 participants, which is the NCAA minimum requirement; and in 2015-16, GC reported a roster size of 7, when there were only 5 participants.

160.    GC does not provide necessary funding for more female teams than male teams. The lack of necessary funding limits female athletes' participation opportunities. For example, women's T&F XC does not have the money or resources to support more participation opportunities sufficient to compete in many T&F XC events or to provide intra-practice competition necessary for team members to improve.

41

161.     Student Plaintiff Sommer Fanney would benefit from more participation opportunities for women's T&F XC athletes, which would elevate competition in practice in her event and in turn would raise her level of competition and better prepare her for intercollegiate competition. Currently, Plaintiff Sommer Fanney trains with the men's T&F XC team due to limited female opportunities in T&F XC.

162.     The Student Plaintiffs and the Class have the interest and ability to participate in women's varsity rugby, equestrian, field hockey, triathlon, cheer, golf, and sand volleyball.  High school students (the source of Defendant's incoming, prospective, and future students) also have the interest and ability to participate in those sports as well as others.  Competition exists in all the above sports.

163.     GC made no or minimal positive changes in response to complaints about less participation numbers and requests for more opportunities and varsity sports teams for women, and the discrimination against female students has continued.

164.     Defendant failed to meet the 1978 regulatory deadline for compliance with Title IX's requirement for equity in athletic participation opportunities.  Defendant has never met its compliance obligations and has not added any new female varsity sports in over 10 years. Defendant cannot show a history or continuing progress of program expansion for women or that it has effectively accommodated the needs of its female students.

165.     As a proximate result of Defendant's discriminatory actions, the Student Plaintiffs and Class have been denied their civil right to pursue an equal opportunity to participate in varsity intercollegiate athletics and, as such, been denied the educational, economic, physical, psychological, and social benefits of athletic participation. They have suffered or imminently will suffer irreparable harm and damages associated with, among other things, lost opportunities, loss

42

of future educational and employment opportunities, emotional distress, lost self-esteem, humiliation, and the denial of equal opportunity because of sex.

166. Student Plaintiffs and the Class are entitled to relief, including declaratory and injunctive relief, compensatory damages, attorneys' fees, and costs.

## FOURTH CLAIM FOR RELIEF:  TITLE IX-GC

### (Unequal Athletic Participation Opportunities)

(on behalf of Former Student Plaintiffs)

167. Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 166 of this complaint

168. The Former Student Plaintiffs bring this claim.

169. Former Student Plaintiff Gretta Eller was a member of her high school women's varsity cheer team and while a student at GC had the ability and interest to participate in women's varsity **cheer**.

170. While a student at GC, Former Student Plaintiff Tess Styrk had the ability and interest to participate in women's varsity **triathlon**.

171. Former Student Plaintiff Kate Jenkins-Sullivan was a member of a competitive crew team during her high school years and while a student at GC had the ability and interest to participate in women's varsity **crew**.

172. While a student at GC, Former Student Plaintiff Allison Hewitt had the ability and interest to participate in women's varsity **golf**.

173. While a student at GC, Former Student Plaintiff Nina Troy had the ability and interest to participate in women's varsity **equestrian**.

43

174.    While a student at GC, Former Student Plaintiff Taryn McFadden had the ability and interest to participate in women's varsity **rugby**.

175.    Former Student Plaintiffs Gretta Eller, Emily Cash, Tess Stryk, Kate Jenkins-Sullivan, and Laura Adair were members of the varsity T&F XC and suffered due to GC's failure to provide necessary funding for additional participation opportunities. Each would have benefitted from more participation opportunities for women's T&F XC athletes, which would have elevated competition in practice in their events, and in turn raised their level of competition and better prepared them for intercollegiate competition.

176.    As a result of Defendant's discriminatory actions, the Former Student Plaintiffs have been denied their civil right to pursue an equal opportunity to participate in varsity intercollegiate athletics and, as such, have been denied the educational, economic, physical, psychological, and social benefits of athletic participation. They have suffered economic and compensatory damages associated with, among other things, lost opportunities, loss of future educational and employment opportunities, emotional distress, lost self-esteem, humiliation, and the denial of equal opportunity because of sex.

177.    The Former Student Plaintiffs are entitled to relief, including compensatory damages, attorneys' fees, and costs.

## FIFTH CLAIM FOR RELIEF:  TITLE IX-GC

### (Discrimination in Employment)

### (on behalf of Coaches Kimberly and Danny)

178.    Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 177 inclusive of this complaint.

44

179.     GC discriminated against Coach Kimberly because she was the coach of women's T&F XC teams and because she is a female, and against Coach Danny because he was the coach of the women's T&F XC teams, each in the conditions of their employment at GC.

### Coach Danny Begins Work at GC

180.     In Fall 2009, Coach Danny became a volunteer assistant coach for GC T&F (indoor and outdoor) assigned to the women's team under men's and women's head T&F coach Bill Cason.  In Spring 2010, Coach Danny was paid a stipend of $1,000 as a contractor in the same position.   In Fall 2010, Coach Danny was a paid employee of GC in the same position for a $2500.00 stipend. During that time, the women track athletes were treated much less favorably than the male athletes by Coach Cason.  For example, Coach Cason coached only the male athletes, changed practice times and failed to inform the female athletes, made disparaging remarks about the women as athletes and about their physical appearance including their weight, used the budgeted money for both men and women's teams disproportionately for the men, and gave the men priority for benefits.  For example, Cason provided the male athletes with sufficient food at away meets but only allowed women to have access to the male team's remaining food and provided t-shirts for the men only.

### Spring 2011- Coach Kimberly Begins Work at GC

181.     In Spring of 2011, Coach Kimberly became a volunteer assistant coach for GC T&F (indoor and outdoor) assigned to the women's team under Cason. In this capacity, she worked with Coach Danny.

182.     During Spring 2011, the female track athletes, Heidi Pinkerton, then GC Head Cross Country Coach for men and women, the AD secretary, and Coaches Danny and Kimberly reported the egregious maltreatment of female track athletes by Cason to AD Palombo.  AD

45

Palombo advised that they work out the problems themselves and said they were due to personality conflicts and not gender discrimination, thus blaming the Plaintiff coaches and Coach Pinkerton. In response, Coach Pinkerton resigned from all positions at GC at the end of spring 2011 due to the inequitable treatment of the female track athletes and herself as a coach.

<u>Fall 2011</u>

183.    In Fall 2011, Coach Kimberly remained a volunteer. Coaches Danny and Kimberly's daughter ran T&F XC at GC as a freshwoman. AD Palombo announced that Coach Kimberly was coming in to help the women's program and GC listed Coach Kimberly as assistant coach of T&F XC for both men and women.  Coaches Danny and Kimberly worked with the women's teams primarily and Cason worked with the men's teams.   It was understood by AD Palombo and Coaches Danny and Kimberly that they were functioning as co-head coaches of the women's T&F and XC teams.  Coaches Danny and Kimberly were treated as head coaches, which included background checks that are only given to head coaches, and access to banner web, which is internal faculty staff software, and given masters keys to athletic facilities, and decision-making authority for the women's team. Coaches Danny and Kimberly were able to make some improvement in the treatment of the female athletes, for example, ensuring that the women were provided with equal portions of food.   But the unfair treatment as second-class citizens under Cason continued, including degrading and disparaging comments by Cason toward women.

184.   Coach Kimberly complained over that semester to GC administration including AD Palombo, Human Respurces Director ("HR") and Title IX Coordinator John Sanders about the unfair and discriminatory treatment as a violation of Title IX. They each responded falsely

46

that GC was in compliance with Title IX. When nothing changed, Coach Kimberly contacted VP Randy Doss, who requested that she document everything and report back.

185.    In November 2011, Coach Kimberly provided a report to VP Doss detailing the unequal treatment. He advised that she continue documenting those issues. At that time, Coach Kimberly was given the responsibilities as GC's women's XC head coach for the NCAA South/Southeast Meet, a regional competition.  Coach Kimberly attended the cross-country regionals in Texas as the head women's coach and Cason attended as the head coach for men. Cason again used money budgeted for both teams disproportionately for the men, including, for example, using team money to pay for massages for men.  All the while, at GC, the men's team was provided locker rooms but not the women's team and Cason continued to disparage the women, including deriding them as not "real" athletes. Coach Kimberly documented this continued inequitable treatment of women athletes and informed VP Doss, who appeared very concerned.

<u>Spring 2012</u>

186.    One month later, on January 6, 2012, GC terminated Cason, but this did not remedy the Title IX violations and discrimination of Coaches Kimberly and Danny.

187.    During salary negotiations with AD Palombo, Coaches Danny and Kimberly requested that Coach Danny be named as head coach of men and Coach Kimberly be named as head coach of women to fill in the two coaching spots vacated by Pinkerton and Cason.  AD Palombo informed them that GC had no head coach slots available and no more money in the budget for the spring.  AD Palombo also said that the T&F and XC teams were in jeopardy of being cut but offered that they could both coach with no more money.  He then promised that if the teams improved, both Coaches Danny and Kimberly would be given head coach positions

47

and be paid accordingly. AD Palombo agreed that Coach Danny would be the official interim head coach of T&F and XC men's and women's teams for Spring 2012. Despite her equal or better qualifications as a T&F XC coach and current role as acting head coach, Coach Kimberly remained in her unpaid position. GC elected only to pay the male coach.

188. AD Palombo also negotiated terms of employment for Fall 2012. Stating that GC had one head coach salary slot available in the Fall, AD Palombo offered Coach Danny that slot as head coach of all 6 T&F XC teams at a salary of $35,000 with benefits, contingent on the teams improving in the spring semester. Coach Danny explained that his retirement pension did not permit him to earn more than $22,500 per year and requested that GC pay each of them $22,000, which AD Palombo rejected. Coach Danny then asked GC to split the salary between them. AD Palombo countered that head coaches cannot be paid that little and offered to keep Coach Danny's salary at $22,000, but pay Coach Kimberly $10,500 and provide $2,000 for an assistant coach. This plan reduced the overall compensation initially offered to the Cash's by AD Palombo by $2500 and ratcheted back the compensation allocated to women's T&F XC coaching by $500 under the guise of spreading the compensation over 3 coaches.

189. The coaches and AD Palombo agreed to that arrangement on paper, including Coach Kimberly as the assistant coach "in name only" for all 6 teams due to GC's alleged technical limitation on the number of available head coach slots. The Plaintiffs relied on AD Palombo's promise that Coach Kimberly would be given head coach status soon. AD Palombo, VP Doss and the GC Human Resource Officer all knew Coach Kimberly was the *de facto* co-head coach of all 6 teams, despite the assistant coach title, and treated her accordingly, again providing her access to banner web, master keys to athletic facilities and decision-making

48

authority for the women's and men's teams. GC always included both Coaches Danny and Kimberly on emails to head coaches and invitations to staff meetings for head coaches only.

190.    Together, Coaches Danny and Kimberly worked hard as co-head coaches with their student-athletes over the spring to improve the program. Due to their presence and by recruiting on campus, they increased the number of women participants and GC's conference standing for both men and women that semester. To improve the program for GC athletes and for recruiting, fundraising and marketing purposes, Coaches Danny and Kimberly requested that GC build a NCAA-sanctioned XC course.  GC approved the addition of a cell tower and $20,000 facility expenditure to cover the costs of the XC course. Relying on these promises and with GC approval, Coaches Danny and Kimberly officially bid to host the 2014 ODAC XC championships based on the availability of the new course.

191.    In August, both Coaches Danny and Kimberly were given year-round contracts reflecting the terms of employment AD Palombo had promised.

<u>Fall 2012</u>

192.    GC continued to underfund T&F XC.  In Fall 2012, Pierre Cadore, a GC alumnus of the football program who wanted to work with Coaches Danny and Kimberly, volunteered as an assistant because AD Palombo said there was no money to pay him.  In Fall 2012, Coaches Danny and Kimberly continued to improve the teams.  Based on the facts that Coach Kimberly was coaching and dedicated much time and resources recruiting, female athletic XC and T&F participation increased-- 4 more female students joined XC and 10 more joined T&F. During that fall, Coach Kimberly continued to push for equality for female athletes in all areas.  Among other things, she requested locker rooms for the female track athletes, citing that male athletes had better and more locker rooms than female athletes at GC and specifically pointed out that male

49

T&F and XC athletes had a locker room. In response, AD Palombo took away the locker rooms for the male track athletes, stating "now we treat the men's team just as bad as we treat women."

At the end of XC season, both the men's and women's teams placed higher in the ODAC conference championships than before, and ODAC selected GC's bid to host the 2014 XC championship.

Spring 2013

193.     In spring 2013, Coaches Danny and Kimberly continued to work under the same terms of employment, rebuilding the T&F and XC programs. At weekly athletic staff meetings, both Coaches Danny and Kimberly, many times alongside other coaches of female athletes, complained to AD Palombo and HR Sanders about the continued unequal treatment of GC female athletes and each of their teams, including about budgets, equipment, locker rooms, facilities and the inferior and absence of medical treatment and staff for all female athletes. Specifically, the women XC and T&F programs had no facility to use for practice or meets. Instead, they practiced at a high school far away from GC facilities, such as bathrooms, training, coaches' offices, meeting rooms, and medical. Coaches Danny and Kimberly complained that alumni donations earmarked for use by specific male teams that GC allowed to go to those teams created large disparities in the budgets for male and female athletic programs and violated federal law. Coaches Danny and Kimberly provided to GC athletic administration a hard copy of the specific provisions of Title IX that prohibited such conduct.

194.     AD Palombo said he would "look into it," but there was never any follow up. Rather, he and HR Sanders continued to state that GC is in compliance with Title IX. Ultimately, AD Palombo, who was Coach Kimberly's supervisor, stopped talking to or taking meetings with Coach Kimberly.

195.   In May 2013, Coach Danny scheduled the required annual end-of-year meeting with his supervisor AD Palombo. Coach Kimberly attended the meeting as well.  Upon seeing Coach Kimberly, AD Palombo told them he needed to keep the meeting short, T&F and XC programs had no budget, which was untrue, and informed them they needed to raise funds for their programs. He also refused to discuss pay raises or Title IX concerns.  Although GC treated Coach Kimberly as a head coach and she performed all the duties of a head coach, AD Palombo reneged on his promise to officially name her as a head coach and pay her accordingly. Coach Kimberly was still listed as an assistant coach and was paid half as much as Coach Danny, although she performed similar duties and was similarly qualified.  Coach Kimberly was concerned about AD Palombo's treatment because she knew this would not only negatively affect her coaching career at GC, but also future job opportunities. Coach Kimberly stayed at GC as a *de facto* head coach because she had made commitments to the athletes she had recruited the team was improving, and she felt she could still make a difference and obtain equality, despite knowing GC could also hold Coaches Danny and Kimberly captive because their daughter was still attending GC and was on the T&F and XC team.

<u>Fall 2013</u>

196.   Despite GC's discouragement and the ongoing violations of Title IX, Coaches Kimberly and Danny continued to build up women's athletics at GC.  In Fall 2013, even though GC's overall enrollment was down, due to Coach Danny and Kimberly's reputations, hard work and recruiting skills, women's XC and T&F gained 5 athletes. For the first time, the GC female XC team was named by the NCAA as an academic honors scholar athletes team.

51

197.     At staff meetings, Coaches Danny and Kimberly and other coaches of women's

teams continued to complain about and raise issues concerning the inequitable treatment of

female athletes and coaches of female teams at GC. Nothing was done by GC.

<u>Spring 2014</u>

198.     In February 2014, Coach Kimberly went to AD Palombo's athletic director office

to discuss her low and unequal pay. He told her that he was too busy with his basketball program

to hear what she had to say.  Around this time, AD Palombo reneged on another promise.   He

told the Coaches Danny and Kimberly that GC changed its position about building a XC course.

Instead of providing the funds as promised, he told them they would need to build a new track

facility/cross-country course themselves using their own money, all the while knowing that a new

XC facility was necessary for the program to continue to improveas it would enhance the student-

athletes' experience and recruiting and allow GC to host NCAA meets.  This also meant that GC

reneged on its commitment to host the 2014 ODAC XC championship, which would have a

deleterious effect on the T&F and XC programs and on Coaches Danny's and Kimberly's

reputations.

199.     AD Palumbo had always treated men differently than women. He paid more

attention and appeared to get along better with men. He often used diminutive terms and gestures

toward women, such as addressing them as "Honey" and referring to the GC "girls" team in

contrast to the GC "men's" teams.  Even after this was brought to his attention, AD Palombo did

not change. In three-way conversations with him, he would address Coach Danny but not Coach

Kimberly, he would not answer her questions, and he made no eye contact with her. AD Palombo

took concerns voiced by men more seriously than those by women.  Due to AD Palombo's

unequal treatment and dismissive conduct toward women, when she wanted results, Coach

52

Kimberly knew she had to send Coach Danny in to speak with AD Palombo on her behalf and also have him schedule meetings to which she would accompany him, just to gain an audience with AD Palombo.

200.     In June 2014, during the end-of-the-year meeting with AD Palombo, which he would schedule only with Coach Danny, Coach Kimberly attended and proposed a new budget option to increase pay for women coaches, including her, and to equalize women athletics.  She framed this as a solution-oriented positive way to address the Title IX issues.  AD Palombo responded by claiming budgetary concerns and threatened to cut the entire the 6 T&F and XC programs if the Cashes kept asking for equitable pay and more resources for the program.  Coach Kimberly pointed out that GC was violating Title IX, but this only inspired AD Palombo to taunt her by saying that she would have to file a Title IX suit if she wanted GC to address anything.  Coach Kimberly felt worthless and powerless because, despite the law, AD Palombo was in charge.  He did not care about the female athletes, the coaches of female teams or gender equality. He was resolved to do nothing unless he was sued and he did nothing.

201.     After that, AD Palombo and GC continued to discriminate and proceeded to retaliate.  Coach Kimberly was ostracized and treated like a pariah by most of the athletic department. For example, since that meeting, AD Palombo refused to meet with Coach Kimberly either alone or with Coach Danny despite repeated requests. Because of dismissive treatment of Coach Kimberly by the athletic administration and the clear signal that continued complaints about gender inequity would be met by GC with cancellation of sports' programs, male and even some female coaches stopped sitting by Coach Kimberly at staff meetings.  Some male coaches would abruptly move to another table or seat if Coach Kimberly sat near them.  The head coach of football told the football team that Coach Kimberly was filing a Title IX complaint and trying

53

to get rid of the GC football program. Some coaches of women's teams would commiserate with Coach Kimberly in private but did not want to risk their jobs or programs by being seen with her in staff meetings or public events.

202. Coach Kimberly attempted to arrange meetings with HR Rick Williams, who was the Title IX Coordinator in 2014. HR Williams would not answer her emails and he failed to show when she had scheduled appointments with him. She was told the best way to meet him was to show up at his office unannounced, which she did only to have HR Williams exit his office as soon as he was alerted to her presence or lock his door and refuse to answer.

203. In 2014, Coach Kimberly emailed HR Williams informing him that she wanted to file a Title IX complaint specifically about her treatment as a female coach and a coach of female athletes. There was no reply.

204. GC had further misrepresented that T&F XC had no budget. Coaches Danny and Kimberly learned that there was in fact a budget for T&F and XC but GC had given money designated to the T&F XC budget as fringe benefits to the football team. At that time, because there was no alternative and GC was the host for the 2014 ODAC XC championship, Coaches Danny and Kimberly, their family and members of the T&F and XC teams began to build a NCAA-sanctioned XC course. Expenses over and above labor were paid for by the Cash's.

<u>Fall 2014</u>

205. In Fall 2014, the T&F XC program continued to develop and improve and, again, increased in the number of female participants by 2. The Cash's and team members poured time, labor and money into the XC course to have it completed by the championships.

206. On November 1, 2014, GC served as hosts of the 2014 ODAC Men's and Women's Cross-Country Championships, which involved 200-300 XC athletes using the new

XC course.  As part of its commitment to host the championships and as expected by the ODAC, AD Palombo and GC Head Athletic Trainer ("Head AT") had committed to attend the championship. November 1 was also the day of GC football homecoming game. November 1 was also cold and sleeting.  Once again, AD Palombo and GC reneged on their promises. The Head AT never showed up, saying he was too busy with football.  AD Palombo never showed.

207.    ODAC requires XC championship hosts to provide a warm enclosed shelter for inclement weather for the championship.  GC denied the XC participants access to any GC rooms in the athletic facility because football was using them all.  Instead, GC had designated a facility for inclement weather in the GC science building.

208.    When participants in the XC championship tried to enter the facility in the science center to escape the rain, sleet and freezing temperatures, and to care for and avoid further injuries, they were denied entrance. Coach Kimberly called AD Palombo, who told her that room could not be used because it was too muddy out.  When asked what she was supposed to do, AD Palombo replied, "I don't know," and hung up.   Coach Kimberly called the nearby elementary school and received permission to use their gym.  This was far inferior to the designated GC facility and proved a logistical nightmare.  GC had to inform people by word of mouth where to go which was different than the information that had been published and disseminated.  A friend of Coaches Danny's and Kimberly's and a GC professor, who also was a certified trainer, agreed to come and work as an AT as a favor to Coaches Danny and Kimberly, although he was not paid.   When the championship was over, GC would not clean or provide funds for cleaning the school but required Coaches Danny and Kimberly to stay that night and clean the elementary gym.

55

209.    After that, Coach Kimberly complained about GC's broken promises and treatment of the team at the weekly Athletic Department staff meeting.  Coach Danny and several female T&F XC athletes complained to the AD Palombo. There was no response.   GC and the ODAC heralded GC XC course as a great course.  GC used pictures of the XC course in its publications and marketing and coaches used it for recruiting.  At the fall regional competition, the GC XC women's team placed higher than they had in the past.

<u>Spring 2015</u>

210.    In January 2015, GC named Todd Clark as the new VP of athletics.

211.    In Spring 2015, the female T&F XC athletes had become more aware of the blatant inequities to female athletes at GC.   After being required to build their own course and witnessing GC's abysmal conduct and lack of support at the ODAC XC championship, it was obvious that GC was discriminating against them as well as the other female athletes at GC. Some of the women on the T&F XC team began to complain to AD Palombo directly and mentioned Title IX violations. AD Palombo responded again that GC had budgetary issues and remained in compliance with Title IX.

212.    Coaches Danny and Kimberly continued to raise the gender equity issues in staff meetings. Coach Kimberly and several other coaches of women's sports met with GC VP Andy Strickler, who agreed with them that there were Title IX violations, but did nothing. Coach Kimberly attempted numerous times to schedule meetings with HR and Title IX Coordinator Rick Williams and dropped by his HR office multiple times unannounced, but was never able to meet with him.

213.    Coaches Danny and Kimberly also attempted numerous times to meet with AD Palombo. He refused to answer their emails, and when the AD secretary had scheduled a meeting

for them, he would cancel it that day. When they showed up unannounced at his office when the AD secretary indicated he was available, he would tell them he was too busy to speak to them.

214. In April 2015, Coach Kimberly received a letter and certificate from GC from President Fernandes informing her that the GC senior graduating athletes selected her as a person who made significant positive difference in their lives.

215. That season, the GC T&F women's team scored the most points it ever had scored, setting the record for the fastest time in women's school history in the 400 and 200-meter races and broke many school records.

216. Coach Kimberly tried to schedule her end-of-year meeting with AD Palombo as required but he refused. He told her he did not have time to meet with her and made clear to her that he would never meet with her again.

217. In May 2015, the recently hired AD secretary, who was a former T&F XC athlete, resigned because of her concerns over gender equity violations at GC including discrepancies she saw in GC's athletic budgets that favored men's athletic teams over women's.

218. GC's lack of response to any complaints about Title IX and gender inequities in GC athletics, its continued poor treatment of the female athletes, and its demeaning and abusive treatment of Coach Kimberly made it very difficult and uncomfortable for her to work. Coach Kimberly, however, believed that she owed it to her female athletes to stay and work on their behalf and that she still could make a difference from within the athletic department. Over the summer 2015, Coach Kimberly drafted a strategic plan to provide empirical support of the inequities and propose solutions. On or about August 24, 2015, Coach Kimberly emailed the strategic plan and provided hard copies to AD Palombo, HR Williams, VP Todd Clark and GC President Fernandes.

219.     In August 2015, which is the month that each GC Head Coach receives their annual contract, Coach Kimberly received once again her contract as she had every year. Coach Kimberly did not want to sign it without having the opportunity to address the unequal pay, her duties and her incorrect designation as an assistant coach. Coach Kimberly emailed HR Williams and put a note on his door that she had received the contract and had not signed it because she needed to address her salary.  There was no response.  Coach Kimberly did not sign the contract.

220.     There was no response to the strategic plan.  Coach Kimberly followed up by email and verbally with each recipient.  AD Palombo told her he did not read it yet. There was no response from HR Williams.  VP Todd Clark told her he had not read it because it was too long.

221.     The week after she submitted the strategic report, Mike Merkle, from GC facilities, told Coach Kimberly that the women's T&F XC teams were going to get locker rooms because of her strategic report.  He also informed her that the women's teams usually are not provided male-privileged laundry loops because women's teams' budgets could not afford them, but now, the women's T&F XC teams were being issued laundry loops. (Despite this, the team never was able to use laundry loops.)

<u>Fall 2015</u>

222.     That fall season, Coach Kimberly received an email from Merkle informing her that the female athletes were only allowed the use of a locker room part time because the primary use was for visiting teams and officials. The schedule of times the locker room was available varied depending on the officials' need. Merkle emailed her each week (and sometimes only on the day of a scheduling conflict and sometimes never) with the limited times available for the women's teams' use. This wreaked havoc on the athletes, causing uncertainty and last-minute changes, many times resulting in the need for the female athletes to clear out of the locker room

58

with their belongings or being be locked out of the locker room at the end of their practice, with no place to change. These problems made the locker rooms functionally unusable by the female athletes.

223.    On about September 18, 2015, Coach Kimberly attempted to meet with HR Williams about the strategic plan. She arrived at his office unannounced and was told HR Williams was not available.

224.    On about September 19, 2015, Coach Kimberly emailed the strategic report to Stephanie Flamini, the Senior Women's Administrator for the athletic department and head women's basketball. Flamini told Coach Kimberly that she had brought those issues up before and had been met with resistance, and she believed that if she if brought them up again or supported Coach Kimberly that Flamini's job would be in jeopardy.  Flamini also confirmed that AD Palombo was Coach Kimberly' supervisor, like every other head coach, and said that Coach Danny could not be her supervisor due to GC's anti-nepotism policy.

225.    Coach Kimberly continued to try to have meetings with HR Williams to no avail. Each month she approached VP Clark, who continued to tell her he had not read the strategic report.  VP Clark met with Coach Danny and told him that he "planned to have a plan" in the next three to five years about the overall budget complaints Coach Kimberly had made.  Coach Danny inquired about the Title IX and Title-VII violations. VP Clark told him that GC HR had reviewed the strategic plan and that GC was in compliance.

226.    On October 21, 2015, a female XC T&F athlete made a video for a class depicting the unequal treatment by GC of female athletes and published it, as required by the class, on YouTube. The GC athletic administration saw the published video and suggested that she remove it.  After October 26, 2015, some T&F XC female athlete complained in person to AD Palombo

about the inadequacy of the locker rooms.  AD Palombo's responded, "We're doing the best we can."

227.    Meanwhile, in Fall 2015, the GC T&F and XC women athletes continued to improve and receive awards. Plaintiff Sommer Fanney broke the GC 6K record.  In October 2015, for the first time the team placed 2nd at Hagan Stone Classic. They also placed higher in the ODAC conference than the year before.

### Spring 2016

228.    In early 2016, Coach Kimberly spoke with President Fernandes at a GC women's basketball game to discuss the strategic plan she had sent her in August. President Fernandes told Coach Kimberly that she thought she had the strategic plan on her desk.  Coach Kimberly requested a meeting to discuss the report.  President Fernandes said she would look into it.  Later at a different game, an assistant coach and Coach Danny approached President Fernandes, who told them that GC was addressing the concerns in the strategic report.

229.    In February 2016, VP Clark canceled a meeting with Coach Danny regarding the strategic report and budget items. VP Clark then dropped by to talk to Coach Danny at his office but Coach Kimberly was there alone. She asked VP Clark to explain his 3 to 5-year plan to address the issues in the strategic report.  VP Clark told her that he was aware of the Title VII and Title IX problems but GC had no money to remedy them.  When pressed about Coach Kimberly being named as head coach and GC providing assistant coaches for the T&F XC teams as promised in 2012, VP Clark told her there were no head coach slots available, and that he was not aware of any current new hires or new positions added in the athletic department since 2012. In fact, there had been several new hires and positions added- all for men's programs: an additional assistant football coach was hired, a male assistant basketball coach was promoted to

co-head coach, and an assistant baseball coach became paid as a fulltime employee. Coach Danny then came into the office. Coach Kimberly told VP Clark that GC needed to address the Title IX and Title VII problems and that if Coach Kimberly left the T&F XC program, it would fold and that would cost GC more. She also advised they were looking for legal representation. VP Clark said he understood and immediately said he had to go.

230. In February 2016, in a compensation committee meeting with HR Williams. HR Williams told the committee (which had been formed to look into coaching salary inequities at GC) that there were no discrepancies or inequality with coaches' pay. A female head coach looked at him skeptically. He recanted and said "well, not too many" and that GC remained in compliance with Title IX.

231. On March 8, 2016, at a staff meeting, Coach Kimberly learned that GC was holding a speed and agility clinic for all GC athletes. Coach Kimberly, whose expertise was speed and agility and who was the most qualified person at GC in this area, was not asked to participate or considered. Being on the staff of this clinic was important for marketing for the T&F XC programs and for Coach Kimberly's career at GC or future career. The planned staff was all football and male. She asked at a staff meeting why she was not being allowed to participate in this opportunity. AD Palombo and the head football coach told her it was already planned out and they would let her know if they needed her help.

232. In March 2016, an attorney sent a letter to GC on behalf of Coach Kimberly referencing her pay and advising that GC was in violation of the Equal Pay Act. After that, on March 28, 2016, GC removed Coach Kimberly from all emails about head coach meetings and information for head coaches.

233.     Around this time, GC had plans to build a new football fieldhouse, giving football new more spacious locker rooms and the male football coaches their own locker rooms.  The GC administration offered that female athletes would have more locker rooms because they would have access to the old locker rooms.

234.     On March 29, 2016, Brett Hacker, GC Director of Facilities and Energy Management, attended a coaching staff meeting.  There, Coach Kimberly explained to him why female athletic teams overall needed office space and locker rooms, and specifically that T&F needed an indoor track, which would benefit all athletic teams.  Hacker told Coaches Kimberly and Danny that GC was building a new tennis court. He asked them if AD Palombo or VP Clark knew about the XC course because the tennis court was being built right in the middle of the course. Coaches Kimberly and Danny were dumbfounded, not only because the course would be unusable but also because they had received approval from GC and had bid to host NCAA XC regionals in 2018.  Hacker told them GC had already approached the city for approval of the tennis court, and bids to construct it had been solicited and received.  He advised that GC could not halt this process because of the financial repercussions to GC.   He said no one ever brought the importance of the XC course or a track to the GC facilities department and that, as the director of GC facilities, he thought those would be important assets to the college and the community.

235.     Coach Danny talked to AD Palombo, who did nothing. Coach Kimberly talked to VP Clark, who said he did not know about this and that he did not realize that the XC course was that close. When asked about the bid for NCAA regionals, he said "let's see."  Coach Kimberly was very concerned, not only because of the loss of the XC course that she had helped build with her own hands, but she also knew that if GC were selected to host the NCAA regionals and they

62

were forced to back out, that would negatively affect GC T&F XC teams' reputations and would be devastating to her and Coach Danny's careers at GC and any future career opportunities.

236. Coach Kimberly's employment became more hostile and much more difficult for her. GC's unprofessional treatment of her by refusing to take her concerns seriously, refusing to honor their promises to her, refusing to meet with her, refusing to speak with her, refusing to alert her or consult with her about significant issues that would impact her teams, causing other coaches to stop speaking with her out of fear for their jobs and finally excluding her from all communications with or about head coaches at GC, which were necessary for her to function in her job, deeply affected her.

237. GC's failure to treat female athletes and coaches of females equally and to continue to discriminate against them in the face of objective evidence and despite many complaints made it difficult for her to effectively recruit to the program and remain positive about the experience that a potential recruit would face at GC. The stressful environment at the GC athletic department was beginning to cause friction in Coach Danny's and Kimberly's family life. Coach Danny realized that he would lose his job as head coach if he supported his wife 100% in public and was afraid he would never be able to secure a job again. Coach Kimberly became depressed and sought therapy. She attended a few sessions but was unable to afford more.

238. On about April 4, 2016, Coach Kimberly told AD Palombo that she did not intend to return for the same salary, advising him it was in violation of the FSLA because she was making less than minimum wage.

239. On May 11, 2016, Coach Kimberly again learned that assigned fringe benefits budgeted money to T&F XC was being used by football.

63

240.   In May 2016, Coach Kimberly received a letter and certificates from GC informing her that the GC graduating senior class selected her as a person who made a positive difference in their lives.

241.   That spring season, the women's T&F team continued to have individual improvements.

242.   On May 19, 2016, Coach Kimberly was sent her annual contract for renewal with the same terms of employment. This timing was three months earlier than when GC sends their contracts for head coaches, and no other head coach at GC was sent one at that time.  She had not had her end-of-the-year meeting with her supervisor because no one in GC administration would meet with her.  The atypical timing and circumstances felt intimidating and harassing and Coach Kimberly believed that GC was trying to fire her. Coach Kimberly went to AD Palombo's office and asked about the timing. AD Palombo told her he did not have time to talk about it.  She continued to try to meet with her supervisor AD Palombo but he would not meet with her.

243.   On May 25, 2016, GC replied to the attorney that had previously written to GC on Coach Kimberly's behalf regarding unequal treatment because of gender.  The GC letter falsely stated that Coach Danny, not AD Palombo, had placed Coach Kimberly in charge of the women's T&F XC teams, that the two of them as spouses worked that arrangement out themselves to lessen his duties as head coach, and that Coach Kimberly had no authority to function as a head coach because the AD is the only one with authority to delegate.  GC also wrote that GC's pay data demonstrates there is no pay disparity between genders and no disparity based on gender in athletics.

244.    Thereafter, Coach Kimberly tried to meet with anyone in the administration at GC to discuss the contract that had been sent and GC's letter and to ascertain whether she had a job. No one would meet with her.  AD Palombo told her to sign the contract or leave.

245.    Coach Kimberly equivocated between continuing to fight in hope GC would do something and leaving because of the discrimination and abusive work environment.  Staying at GC in this continuing hostile environment where she was treated as a second-class citizen, and she would be complicit in treating her female athletes as second-class citizens was extremely stressful. Staying at GC where she was no longer considered a head coach also made it very difficult to get another job somewhere else. On the other hand, even though she was receiving very little pay and no benefits, with five children and Coach Danny's low pay, Coach Kimberly could not afford to give up this income with the prospect of limited job opportunities due to GC's treatment of her.   Coach Kimberly was paralyzed between two unacceptable options.   She did not sign her contract.

246.    In the second week in August, there was a mandatory athletic staff meeting at GC. It was too difficult for Coach Kimberly to attend under the circumstances.  Coach Danny told AD Palombo that Coach Kimberly had alerted AD Palombo that she was not coming back unless he fixed her salary.  AD Palombo told Coach Danny her salary was "out of my hands, I don't have control over that."  Within days, GC shut down Coach Kimberly's email account with no notice and never communicated with her again.  Later, AD Palombo told Coach Danny to get a resignation letter from Coach Kimberly.

247.    On September 1, 2016, Coach Kimberly sent a letter informing GC that she was not resigning but that GC was forcing her out.

248.     In August 2016, Coach Danny requested in writing from AD Palombo an increase in his salary asking for an additional six thousand to bring his salary to $28,500, which was still well below other head coach salaries who coach one sport and just under the amount that would have not have been permissible to maintain his pension, and $2500 for an assistant.  He tried to meet with AD Palombo to discuss, but AD Palombo would not meet with him.   This was very concerning as there was no co-head coach for the six T&F XC teams and no assistant and it would be impossible for Coach Danny to keep recruiting and improving both programs without those positions filled.

Fall 2016

249.     In September 2016, Coach Danny remained the lone head coach of all six T&F XC teams and had taken over Coach Kimberly's duties and responsibilities.  Both male and female athletes left the team because of the treatment of the T&F XC teams by GC and limited resources.

250.     Because AD Palombo refused to meet with Coach Danny about the conditions of his current job and the negative impact it was having on the student athletes, Coach Danny sent letters about his salary to AD Palombo, HR Williams, VP Clark, and President Fernandes. In addition, he went in person to attempt to speak with HR Williams but he again was never available. GC was now treating Coach Danny like an outcast similarly to the way it had treated Coach Kimberly.   This was extremely stressful to Coach Danny because he was worried about losing his job.  Now that Coach Kimberly had no income and no job prospects, he was the sole provider for their family. The issues, however, were too important to the student athletes and to his own career to refrain from pursuing them.

66

251.     On October 12, 2016, Coach Danny met with and spoke to HR Williams about his earlier email regarding his requests for salary and assistants. After that conversation, HR Williams emailed back, informing Coach Danny that he had discussed the issues with VP Clark who said that he intended to address these issues with AD Palombo.

252.     In the middle of the XC season and preparing for indoor T&F for both the men's and women's teams and recruiting for all six teams, Coach Danny was overwhelmed. The only help he received was from assistant Coach Cadore, who was part time and had another full-time job. During this fall, Coach Danny's mother had become suddenly critically ill with an unpromising prognosis. Coach Danny was his mother's sole caretaker. He did his best to schedule medical appointments around practice times but, when there was a conflict and Coach Danny could not attend practice, there was no one to run them. In those cases, he would send individualized running workouts for each athlete but because practice required hands on coaching and fluid changes depending on running time, conditions and physical state of the athlete, he would schedule practice times on Saturday to make up. Scheduling on Saturdays was much more difficult for the athletes as it disrupted their academic schedules and their training cycles and there was no necessary support from GC, such as athletic trainers and medical care.

253.     At an October weekly staff meeting, he informed AD Palombo and SWA Flamini and others, saying that his mother had been diagnosed with a terminal illness and if there was another head coach or fulltime assistant for his program, he would be home with his mother on FMLA. At this time, due to the GC athletic administrators openly hostile treatment of Coach Danny since Coach Kimberly had left, other coaches were avoiding Coach Danny and sitting away from him or moving seats in these meetings just as they had to Coach Kimberly and avoided him in public. Only the head coach of volleyball spoke up and offered to help Coach

67

Danny, which he appreciated but was impractical due to her fall practice and game schedule. Several of the coaches of women's teams met with Coach Danny in private to support him and commiserate. They confided in him that they were afraid to be seen with him because they feared losing their jobs based on what happened to Coach Kimberly and how the athletic administration was now treating Coach Danny.

254.    Coach Danny continued to document the issues, including his salary request and that the teams needed an assistant desperately, and sought permission to post for an assistant. The compensation committee was ongoing in its attempt to correct coaches' salaries. Throughout this fall, male and female athletes from T&F XC made complaints to AD Palombo about the need for an assistant coach. AD Palombo would either have no time to meet or he would tell them he was working on it.

255.    On October 11, 2016, Coach Danny emailed HR Williams about his mother's grave medical condition and that he may need to take Family Medical Leave Act time off ("FMLA"). On October 12, 2016, HR Williams emailed him the FMLA form. Coach Danny did not take FMLA because he did not want to leave the teams without a coach or give GC any reason to try to terminate him.  On October 28, 2016, Coach Danny emailed AD Palombo, VP Clark, HR Williams and President Fernandes regarding his salary and the need for a T&F XC assistant. VP Clark asked Coach Danny to submit a request for a part-time assistant T&F XC coach for $11,400.00 and said he would approve it.  He told Coach Danny to try to post the position.

256.    In October 2016, several coaches of women's teams, who had previously expressed interest in meeting with a Title IX lawyer to understand their rights, were asked to join in as one was scheduled by Coaches Danny and Kimberly.   That month, information began

68

circulating throughout the athletic department that Coaches Danny and Kimberly were going to have a meeting with a Title IX lawyer.

257.    At the beginning of November 2016, a GC attorney and President Fernandes scheduled individual mandatory meetings with all the women's teams' head coaches, except Coach Danny.  Coach Danny not only felt excluded but became even more concerned for his job security.  In these meetings, coaches were requested not to attend the meeting with Coaches Danny and Kimberly and their lawyer; and were told that any money used to fight a Title IX lawsuit would be taken from athletic budgets, the coaches' programs would suffer, and GC may have to cut coaching positions.  Upon learning of the reasons for these meetings, Coach Danny scheduled a meeting with President Fernandes for November 8, 2016.

258.    On November 7, 2016, Coach Danny corrected and sent back inaccurate information that the Compensation Committee had provided him about his tenure at GC, including inaccurate information that he was listed as an assistant coach and was being paid less than he was.

259.    On November 8, 2016, just before meeting with President Fernandes, VP Clark went to Coach Danny's office unannounced. He informed Coach Danny that he was no longer the head women's T&F XC coach; that GC was conducting a search for a head coach for women's T&F XC; that T&F XC would lose any assistant coaches positions; and that GC was splitting the budgets that had been used for all six T&F XC teams in half.  Coach Danny was shocked.  He asked to remain the head coach of the women's T&F and XC to keep that program strong and GC to find a head coach for the men's programs.  VP Clark said no and told Coach Danny that they were going to hire a woman for the job. Coach Danny asked how much GC was planning on paying the new head coach.  VP Clark told him "just under what you are making,"

69

(which is the amount Coach Kimberly had been requesting). Coach Danny expressed surprise in light of the fact that this would disrupt the women's teams in the middle of the season, that GC had made these decisions without consulting him and that he thought it was not in the best interest of either the men's or women's programs. VP Clark responded, "That's what we are doing," and left.

260.    Coach Danny then met with President Fernandes, outlined the issues in the strategic plan, and discussed the need for assistant coaches for T&F XC, advising that creating a new head coach position did not solve the need. President Fernandes advised that she had not been aware of these issues but would now be addressing them and taking action, informing Coach Danny that GC had an eight-step plan to address them, but provided no details.

261.    Coach Danny went to SWA Flamini and asked why they had not offered the job to Coach Kimberly based on her prior success there and the respect the student athletes had for her. SWA Flamini said dubiously that Coach Kimberly could apply. Coach Danny asked what had changed for GC to make this decision. SWA Flamini said that nothing had changed. Coach Danny learned that GC was planning on paying the new Head Coach $23,703, which was just under what Coach Danny was making-- $24,500—both of which were well under the minimum for a head coach salary at GC for one team.

262.    At a meeting the following day, SWA Flamini confirmed that he was no longer the head coach of women's T&F XC but told him that he would have to keep coaching the women's teams until they filled the head coach position. She also told Coach Danny not to tell the T&F XC teams and that she would schedule a meeting with women's T&F XC, which was eventually scheduled for November 16, 2016.

263.    On November 15, 2016, GC posted the women's T&F XC Head Coach position on the internet.

264.    The T&F XC teams saw the posting that night.  They called Coaches Danny and Kimberly very upset and concerned about the unfair decision, and informed them they wanted Coach Danny to be the coach, especially because it was in the middle of the season. Many indicated they wanted to quit the team and asked about next steps. Coach Danny, feeling caught in the middle between the women athletes and remaining professional as a GC employee, told them to focus on their studies and that he would try to do anything he could to make the transition successful.

265.    The following day, SWA Flamini held the meeting with the women T&F XC athletes. Coach Danny was not allowed at the meeting despite that he and the team members felt that would have assisted in the transition.

266.    Meanwhile, a meeting had been scheduled by Coaches Danny and Kimberly off campus for November 20, 2016 with a Title IX attorney and any coach that wanted to attend. A head coach of women's sports team at GC told Coach Danny that the head coach had decided not to attend because of fear that GC would fire that coach if that coach attended but offered to help with a lawsuit in any other way.

267.    On November 20, 2016, an attorney met with some GC coaches of women's teams to discuss Title IX. Many of the women's coaches who had committed did not show out of fear of retaliation.

268.    On November 23, 2016, President Fernandes emailed Coaches Danny and Kimberly (to her now defunct GC email address) expressing her appreciation for them as dual

71

coaches. On November 28, 2016, President Fernandes sent an email to the entire GC community about GC's commitment to diversity and zero tolerance for discrimination.

269.    At the November 29, 2016 coach staff meeting, GC's VP for advancement addressed the staff about fundraising. At this meeting, it was even more apparent that everyone was avoiding Coach Danny, sitting away from him in obscure seats and moving to other tables if he sat with them. The VP told the coaches that they each needed to engage in fundraising or lose their program because the College was in financial trouble. Coaches of women's teams raised the mandatory meeting with the GC lawyer and the President, in which they were requested not to attend the meeting with a lawyer about Title IX, and said it was illegal. The head coach of volleyball asked what the 8-step plan was about fundraising for locker rooms and facility upgrades for women athletes that President Fernandes had been referring to and asked about any locker room plans to help women's sports. The VP stated that he had not seen any plans for fundraising for those projects.

270.    On December 3, 2016, the compensation committee update was sent to coaches.

271.    On December 5, 2016, SWA Flamini told Coach Danny that GC would keep him informed about the new head coach position. Again, she confirmed that Coach Danny was not the head coach of the women's teams, although he was required to continue coaching them. Coach Danny questioned the fairness and told her GC would never require the men's soccer coach to also coach the women's soccer team. She said that was different since the men's soccer coach never coached both.

272.    On December 12, 2016, SWA Flamini approached Coach Danny to discover who had been telling coaches not to attend the meeting with the Title IX attorney. He told her it was said in the meetings with the GC attorney and the President.

273.    In mid-December, SWA Flamini instructed Coach Danny to cancel the women's first indoor track meet, which was a critical meet, because they did not have a coach. Coach Danny canceled it as instructed. He also canceled the men's first indoor track meet because it was not fair to send the men's team only as it would deprive the women of future competitions because the budget only allowed for men and women to use the same bus. Because this meet was a very important meet for distance runners, the athletes were very upset with the administration. Plaintiff Stryk decided not to participate in the winter track program because of the discriminatory treatment and the removal of Coach Danny as her coach.

274.    At the conclusion of the XC season, there were multiple academic awards and both the men and women were recognized by NCAA and USTFXCCA as an All-Academic team, and women broke school records, including Plaintiff Sommer Fanney again setting the 6K record for GC, which still holds today.

<u>Spring 2017</u>

275.    Over the winter break, it was very difficult for Coach Danny to continue to coach both the men's and women's T&F XC teams, send out conditioning packets, schedule and prepare for the upcoming seasons and recruit, especially with the uncertainty of the timing and choice of a new head coach for the women. He was also caring for his mother and assisting her pursuit of experimental medical treatments. On January 4, 2017, part-time assistant Coach Cadore advised Coach Danny that he was resigning. In a letter to GC, he based his decision to resign based on GC's discriminatory treatment of the T&F XC teams and the coaches and his low salary.

276.    Coach Danny invigorated his efforts to convince GC to hire an assistant coach for each the men's and the women's programs. AD Palombo reiterated that there was only one

73

position available and it needed to be shared by the men's and women's teams. SWA Flamini told Coach Danny GC would not look to fill an assistant coach position until the women's head coach was hired. On January 11, 2017, the department secretary resigned based on, among other concerns, the unfair and unequal treatment of women and female athletes in the athletic department.

277. On January 12, 2017, HR Williams announced he was conducting an annual performance evaluation of coaches. Coach Danny and other coaches were worried that these negative evaluations would be used as a pretext to terminate coaches that were complaining, particularly since there had been no annual evaluation conducted since 2012.

278. On January 17, 2016, a final compensation plan was provided to Coach Danny, which included information that showed the salary he would be making in the future based on certain factors. The information was again incorrect, including his wrong grade based on the wrong number of years of experience. The salary the final compensation plan established for Coach Danny was $34,590.00, which was just slightly above his pension-plan cutoff. If he accepted this, it would cause him to lose his retirement pension as was known by GC.

279. Coach Danny tried to meet with HR Williams to discuss that this salary would put him over his retirement pension cutoff. When he was unable to meet with HR Williams, he spoke with another HR administrator and requested that he get paid less, just as had occurred in the past to adjust for his pension cutoff, and to use the remaining money to help with the T&F XC programs. The administrator told him she would discuss that with HR Williams. In the next few days, HR Williams told Coach Danny that HR Williams did not have the authority to split the salary and that Coach Danny should speak with AD Palombo. AD Palombo sent Danny back to HR with no resolution.

74

280.     On January 19, 2017, the T&F XC teams were told of Coach Cadore's resignation.  The team leaders, both men and women, voiced their concerns over all the problems with the current T&F XC programs and arranged meetings with VP Clark and AD Palombo. SWA Flamini instructed Coach Danny to tell the team to be civil and not to cause any problems, especially with the upcoming interviews with candidates for the head coach of the women's teams. Coach Danny told SWA Flamini that the team was not just upset about Coach Cadore but about what has been happening to the women's T&F XC program over years.  SWA Flamini became upset when Coach Danny defended Coach Cadore's reasons for leaving.

281.     In the next weeks, several candidates for the women's T&F XC head coach position went to GC.  Coach Danny was only allowed to meet with some of them.

282.     On January 24, 2017, at an athletic staff meeting, HR Williams corrected the salary chart, which had been based on year-round employee status, and told coaches they were only considered 10-month employees and the salary amounts listed needed to be reduced by two months. Reducing Coach Danny's salary by two-months resulted in a salary of $32,837.00, which was still over his pension cutoff. After a conversation with HR Williams, he told Coach Danny he would use a formula that lowered his salary to $28,825.00, which was below Coach Danny's pension cutoff.

283.     In a meeting with Coach Danny, and in a compensation committee meeting, HR Williams stated that the GC compensation committee study showed that women coaches were not paid as much as men coaches at GC and, based on that, GC would not be paying women coaches as much as men coaches.

284.     HR Williams still never clarified which salary applied or corrected the data and the process was confusing.  Coach Danny was very concerned about staying at GC and accepting

any raise because he was not sure if he would exceed his pension limit. Coach Danny raised the issue of the incorrect classification on his compensation plan salary adjustment and tried to get an answer on is salary. HR Williams had no answer. HR Williams announced his resignation on February 10, 2017 without finalizing Coach Danny's salary, and resigned at the end of March. Coach Danny was told the new pay scale would be effective March 2017.

285.    Other coaches of women's teams expressed to Coach Danny that the new salaries really did not change the inequities and it was clear that GC was not changing its ways. Several of the coaches of women's teams told Coach Danny in private that they supported Coaches Danny and Kimberly regarding the Title IX issues but each believed that the splitting of the T&F XC programs and removing Coach Danny from the women's programs and then creating a fulltime head coach position for the women's T&F XC teams was retaliation for Coach Kimberly and then Coach Danny pushing the gender equity issues. They expressed fear in being publicly involved out of similar retaliation.

286.    At the beginning of February, SWA Flamini advised Coach Danny that GC would be extending an offer to a candidate that week with an expected start date of February 20. Coach Danny had been coaching both programs alone since January 4. February 20 was only 6 days before the Indoor championships. It was extremely difficult and stress-producing for Coach Danny to be running both programs and recruiting for all six teams while still building the teams and he was counting on a new head coach to step right in and take the women's program. He had become increasingly concerned that GC would use any drop in performance, standings or recruit numbers for either program to terminate him and he focused his efforts to work many hours and last until February 20.

76

287.    On February 7, 2017, the women's T&F XC head coach was selected against Coach Danny's recommendation.  The candidate accepted the position and SWA Flamini advised Coach Danny that she would be starting February 20.

288.    On February 20, 2017, no new head coach of women's T&F XC had been announced or hired.

289.    On February 20, 2016, VP Clark announced GC plans to spend 1.2 million dollars to build new locker rooms, which included women's team lockers and a locker room for women coaches and that men coaches' locker rooms would be designated as public to comply with Title IX issues with buildout plans over the summer to be ready for Fall 2017.  Many coaches doubted this would happen. It did not.

290.    On February 22, 2017, SWA Flamini dropped by Coach Danny's office and told him that the new coach would be there on March 2.

291.    That week, several of the coaches of women's teams met with President Fernandes to discuss the recent hiring of an assistant football coach to run the athletic center without opening it up to others, such as other women's assistant coaches who needed the assistance, and other Title IX issues.  President Fernandez seemed disinterested and ensured them there were no Title IX issues.

292.    On March 2, 2017, twenty minutes before the men's and women's T&F XC practice, Coach Danny was informed that the New Head Coach was there.  The New Head Coach was unaware of any of the Title IX or ongoing issues with the T&F XC programs.  GC did not have an office ready for the New Head Coach use but gave her a temporary room on a different floor than Coach Danny's office.  Coach Danny asked if GC would find an office near his since the distance would be prohibitive for the T&F XC programs.  AD Palombo and SWA Flamini

77

dismissed this. This was very stressful for Coach Danny and not the smooth transition for which he had hoped.

293.    GC's timing of hiring and onboarding of the New Head Coach showed it did not care about the women's T&F XC program or Coach Danny. The New Head Coach had no experience as a head coach or in preparing certain practices and events, and she had not been trained by GC, shown how anything worked at GC or given a computer or any access codes. Coach Danny had to assist and train her to make sure the women's program could run. Under these circumstances, the New Head Coach was unable to function capably and the athletes kept going to Coach Danny for coaching and advice, which upset the New Head Coach. The first outdoor track competition had to be canceled to give the New Head Coach time to transition.

294.    The transition with the New Head Coach was tough and caused more distress and chaos than had Coach Danny simply continued coaching both the men's and women's programs. His stress level elevated and he believed that GC was doing its best to make his employment so unbearable he would leave- like it did to Coach Kimberly. Coach Danny stayed because he needed the money to support his family and he was determined not to allow GC to treat him and the women's programs this way. In March 2017, he was told GC would post the assistant position later that week in mid-March. As the stress grew and his salary was yet unknown, Coach Danny began to look for new employment.

295.    On March 14, 2017, Coach Danny submitted to his supervisor his report regarding the Annual Staff Appraisal of his performance. The last performance appraisal was done in 2012. On March 24, 2017, Coach Danny scheduled meetings with AD Palombo, SWA Flamini and a third person to discuss the tense atmosphere and problems with the program, including the New Head Coach advocating for separate men's and women's programs with separate budgets and

78

coaching staff. He asked about his role and responsibilities. He was told the T&F XC men's and women's program was one program with one budget and they needed to work together until the end of the season and then it would be addressed.

296. On March 24, 2017, Coach Danny, stressed and exhausted, informed the athletic department that he expected he would need approval for FMLA to take care of his dying mother. FMLA was approved to begin March 28, 2017. He met with the teams and the New Head Coach and organized the transition. Coach Danny, who had spent much time teaching the New Head Coach the basics of head coaching, including how to provide and appropriately enter meet entries for the team, was worried because she was not experienced at some of the skills, at one point failing to provide timely entries and causing women runners to miss competitions. He left detailed instructions with an offer to assist if needed.

297. In the end of March, Coach Danny discovered, based on the monthly paycheck only because he did the math over the next year, that his new salary put him just over his pension threshold, which he would reach in December 2017, forcing him to leave before that date or forfeit his pension. Coach Danny felt this was GC trying to force him to resign. Coach Danny talked to the GC athletic administration and explained that this put him over his pension threshold and he would not be able to stay. VP Clark told Coach Danny, "there's nothing we can do about it based onto the compensation committee- but I'll get back to you."

298. While on FMLA leave and busy with his mother, women T&F athletes contacted him alerting him to some problems. Coach Danny asked AD Palombo to assist. The AD then required Coach Danny to participate in phone conferences and meetings while he was on FMLA leave. The new assistant coach position for T&F XC was posted the day Coach Danny left on FMLA leave. Due to continued problems with the team, the athletes would call him, and the AD

79

would enlist his help to sort out problems. Coach Danny was required to spend much time (and meet in person with the New Head Coach) dealing with these issues while on FMLA leave. Communication issues between the New Head Coach and athletes arose, and the New Head Coach failed to enter athletes in events. Coach Danny was also asked to review assistant coach candidates from a pool the athletic department selected during this time. Coach Danny intentionally ended his FMLA early on April 20 because of the team problems and so he could attend the ODAC Championships to ensure the student athletes would be treated appropriately and things would go smoothly.

299. The T&F women's team continued to set new school records that spring.

300. Coach Danny, as a ten-month coach, had June and July off. He, however, was required to attend meetings and answer emails in June and July regarding the programs.

301. On June 19, 2017, Coach Danny, after building the T&F XC programs up every year and increasing participants and standings since his performance evaluation in 2012, received an unwarranted negative performance evaluation. This was stressful as it reinforced Coach Danny's belief that GC was creating grounds for his termination or creating an environment that would force him to leave.

302. On June 21, 2017, the New Head Coach recommended a Candidate to be the assistant coach for both men's and women's T&F XC. On July 12, 2017, Coach Danny emailed AD Palombo pointing out the inaccuracies in the performance evaluation and setting forth his reasons why the Candidate was not a good candidate for an assistant coach for T&F XC, among them that that she only had experience in T&F and none in XC. He recommended other candidates.

303.     Coach Danny saw a therapist for stress and anxiety during his FMLA. After his FMLA ended, he was unable to attend because the sessions conflicted with meetings scheduled by AD Palombo, he had no time and he could not afford the cost.

304.     At the beginning of the new employment term in August, the New Head Coach did not answer any contacts by Coach Danny or female T&F XC athletes, which was necessary to prepare for the athletes coming back to school soon. On August 14, 2017, the New Head Coach scheduled a meeting with the women for the next day, which would require them to come to campus before school started and would be a hardship for some. Coach Danny tried to find out what was happening. He was informed by another coach that the New Head Coach had resigned.

305.     Coach Danny spoke with an assistant AD about the upcoming season and he informed Coach Danny that unofficially he understood that the New Head Coach's last day was August 15 and that the Candidate was going to be named Interim Head Coach. No one in the athletic administration contacted Coach Danny or advised him about these changes that would drastically affect his program. The T&F XC teams told Coach Danny that the New Head Coach resigned and the Candidate was the Second New Head Coach.

306.     The following day, Coach Danny emailed AD Palombo to inquire about coaching changes. AD Palombo instructed him to call the Former New Head Coach. Coach Danny was concerned about the impropriety of doing that, and contacted HR. HR told him he should not contact the Former New Head Coach. Coach Danny was very concerned the fall season would be a repeat of the spring, which had been very stressful. HR also told him that his job description did not require him to manage the women's program but that, out of courtesy, he should work with the Second New Head Coach. Although no one from athletic administration had notified Coach Danny about the changes, Coach Danny assisted the Second New Head Coach in moving

81

the fall athletes in. She told Coach Danny that she was just happy to have a job since she had never heard back about the assistant job and that she wanted to learn and would follow Coach Danny's lead. Another coach told Coach Danny that the AD Palombo had stated that the Second New Head Coach was not qualified for the job but it was not his decision and he was instructed to hire her.

307.     SWA Flamini met Coach Danny and told him she had been instructed to have a meeting with his team to make sure there were no issues with the coaching change. Coach Danny told her no one had spoken to him about the changes. She advised him of the change and told him that she did not have to notify him because the men's and women's T&F XC programs were split. She then stated that Coach Danny needed to help out and teach the Second New Head Coach and that Coach Danny was lucky that GC had two full time coaches for the T&F XC programs.

308.     Coach Danny again spent tremendous time coaching both the men's and women's T&F XC teams and teaching the Second New Head Coach. On September 1, 2017, AD Palombo was removed from his duties as AD, where he now focuses solely on his duties as the head coach of men's basketball. A new AD was hired. The new AD informed Coach Danny he needed to speak with him about his issues. The department was tense and other coaches have told Coach Danny in private they are worried that the new administration is going to fire him any day. Once again, Coach Danny was in fear of losing his job, and stressed and exhausted coaching six teams and teaching a new coach with no assistant.

309.     Coach Danny continues to be required to coach women's T&F XC in addition to the men's T&F XC team. The Second New Head Coach has no experience in XC and is not

available for all practices. The excessive work and stress have interfered with his care of his mother and negatively affected his family life.

310. Based on the above, GC has discriminated against Coaches Kimberly and Danny in their employment on the basis of sex.

311. GC has discriminated against Coach Kimberly as a woman and a coach of a women's team in the terms and conditions of her employment, including pay and benefits; failing to provide the financial and personnel resources necessary to fully and properly perform her job, to develop her skills and career, and operate her team as it does for coaches of male athletes; treating her worse than men in the athletic department, including making dismissive and disparaging comments based on negative stereotypical and archaic views of female gender roles; refusing to meet with her; demoting her; subjecting her to an abusive and unprofessional work environment so intolerable as to force her to leave her employment, and taking other adverse work actions.

312. GC's has subjected Coach Kimberly to a continuing hostile environment from 2011 through September 2016.

313. GC discriminated against Coach Danny because he coaches female athletes in the terms and conditions of his employment, including pay and benefits, by, among other ways, failing to provide the financial and personnel resources necessary to fully and properly perform his job, to develop his skills and career, and operate his team as it does for coaches of men's teams, refusing to meet with him, removing him as the head coach of women's T&F XC programs, forcing him to perform coaching and other duties outside his job description, giving him unwarranted negative performance evaluations, mismanaging and manipulating his pay,

83

paying him in a manner GC knew would cause his resignation under a pretext of an increase in pay, and taking other adverse work actions.

314.    GC's has subjected Coach Danny to a continuing hostile environment from 2011 through October 2017.

315.    As a result of Defendant's actions, Coaches Danny and Kimberly have experienced anxiety, depression, and other psychological and physical manifestations of such distress.

316.    As a result of Defendant's actions, Coaches Kimberly and Danny have been and will be damaged in the form of lost employment, lost compensation and benefits, lost professional status and reputation, lost resources for them to do their jobs similar to those provided to coaches of men's sports, and loss of future employment opportunities. Such discrimination has caused and will cause Coaches Danny and Kimberly pain, humiliation, emotional distress, and other damages.

317.    Coach Danny seeks an injunction to prevent the continued discriminatory treatment of him. He seeks continued employment as a head coach at GC and reinstatement to his position as the head coach of women's T&F XC, but without discrimination in the terms and conditions of his employment, including pay and benefits, and the financial and personnel resources necessary to fully and properly perform his job, develop his skills and career, and operate his teams at the Division III level.

## SIXTH CLAIM FOR RELIEF:  TITLE IX-GC

(Retaliation)

(on behalf of Coaches Kimberly and Danny)

318.    Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 317 inclusive of this complaint.

319.    On numerous occasions from 2011 through 2017, Coach Danny complained to all levels of GC administration about the unequal opportunities, treatment and benefits, and requested equal opportunities, treatment and benefits, of female athletes and coaches of female athletes at GC, and hired and met with an attorney regarding the discrimination based on sex.

320.    GC was aware he complained about, and hired and met with a lawyer to discuss the discrimination based on sex.

321.    GC has retaliated and continues to retaliate against Coach Danny because he complained, and hired and met with a lawyer about the gender discrimination, in the terms and conditions of his employment, by, among other things, subjecting him to a hostile environment, constructing a new building in the middle of the NCAA-sanctioned XC course he and his family had built with their labor and money, removing him as the head coach of women's T&F XC programs, forcing him to perform coaching and other duties outside his job description,  forcing him to work and come to GC during his FMLA leave, paying him less than other head coaches, failing to provide him necessary resources to successfully perform his duties,  failing to refill the assistant coach positions for his teams, giving him unwarranted negative performance evaluations, mismanaging and manipulating his pay, paying him in a manner GC knew would cause his resignation under a pretext of an increase in pay, and taking other adverse work actions.

85

322. On numerous occasions from 2011 through 2017, Coach Kimberly complained about the unequal opportunities, treatment and benefits, and requested equal opportunities, treatment and benefits, of female athletes and coaches of female athletes at GC, and hired an attorney to protect her rights.

323. GC was aware she complained about, and hired and met with a lawyer to discuss the discrimination based on sex.

324. Defendant retaliated against Coach Kimberly because she complained about and hired and met with an attorney to discuss the sex-based discrimination, in the terms and conditions of her employment by, among other things, subjecting her to a hostile and abusive environment in her work at GC, constructing a new building in the middle of the NCAA-sanctioned XC course she and her family had built with their labor and money, failing to increase her pay as promised, demoting her, constructively discharging her, and taking other adverse work actions.

325. As a result of Defendant's actions, Coaches Kimberly and Danny have been damaged in the form of lost employment, lost compensation and benefits, lost professional status and reputation, and will be damaged by loss of future employment opportunities. Such discrimination has caused and will cause Coaches Kimberly and Danny pain, humiliation, emotional distress including anxiety, depression, and other psychological and physical manifestations of such distress, monetary damages, and other damages.

326. Coach Danny seeks an injunction to prevent future retaliatory acts and to seek his continued employment at GC and reinstatement as the head coach of the GC women's T&F XC program, where he can engage in protected activity without fear of reprisal, loss of opportunities, adverse actions against his teams, or other adverse actions.

## SEVENTH CLAIM FOR RELIEF:  EQUAL PAY-GC

### (Discrimination)

### (on behalf of Coach Kimberly)

327.    Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 326 above, as if fully set forth herein.

328.    Coach Kimberly was a female was employed at GC between 2012 and 2016.

329.    Coach Kimberly performed work requiring substantially equal skill, effort, and responsibility under similar working conditions as Coach Danny and all other GC male head coaches.

330.    Coach Kimberly was paid less than Coach Danny and other GC male coaches performing substantially the same work under similar circumstances.As a result of Defendant's actions, Coach Kimberly has been damaged in the form of lost employment, lost compensation and benefits, lost professional status and reputation, and will be damaged by loss of future employment opportunities.  Such discrimination has caused Coach Kimberly pain, humiliation, emotional distress including anxiety, depression, and other psychological and physical manifestations of such distress, and other damages.

## EIGHTH CLAIM FOR RELIEF:  EQUAL PAY-GC

### (Retaliation)

### (on behalf of Coach Kimberly)

331.    Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 330 above, as if fully set forth herein.

332.    Coach Kimberly repeatedly complained to GC on numerous occasions while she was an employee that GC was paying her less money for performing work requiring

87

substantially equal skill, effort, and responsibility under similar working conditions as Coach Danny and other GC male coaches. GC retaliated against Coach Kimberly because she complained about the wage discrimination by, as set forth above, continuing to provide unequal pay and no benefits; failing to provide and decreasing the financial and personnel resources necessary to fully and properly perform her job, to develop her skills and career, and operate her team; treating her worse than men in the athletic department, including making dismissive and disparaging comments based on negative stereotypical and archaic views of female gender roles; refusing to meet with her; demoting her, subjecting her to an abusive and unprofessional work environment so intolerable as to force her to leave her employment and taking other adverse work actions.

333.     As a result of Defendant's actions, Coach Kimberly has been and will be damaged in the form of lost employment, lost compensation and benefits, lost professional status and reputation, and loss of future employment opportunities.  Such discrimination has caused Coach Kimberly pain, humiliation, emotional distress including anxiety, depression, and other psychological and physical manifestations of such distress, and other damages.

## NINTH CLAIM FOR RELIEF:

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS-GC, AD Palombo

(on behalf of all Plaintiffs)

334.     Plaintiffs reallege and incorporates herein by this reference paragraphs 1 through 333 above, as if fully set forth herein.

335.     The Defendants knew or should have known that emotional distress was the likely result of their conduct, as described above.

336.     Plaintiffs' mental anguish and emotional distress were foreseeable.

88

337.    The Defendants' conduct in fact caused Plaintiffs severe and extreme mental anguish and emotional distress.

## TENTH CLAIM FOR RELIEF:

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS-GC, AD Palombo

### (on behalf of all Plaintiffs)

338.    Plaintiffs realleges and incorporates herein by this reference paragraphs 1 through 337 above, as if fully set forth herein.

339.    The Defendants actions showed a reckless indifferent to the likelihood that they would cause Plaintiffs severe mental anguish and emotional distress.

340.    The Defendants intended to cause emotional distress.

341.    The Defendants' conduct was extreme and outrageous.

342.    The Defendants' conduct in fact caused Plaintiffs severe and substantial mental anguish and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.    Certify the first and third claims as a class action on behalf of all present, prospective, and future female students at GC who seek to participate in varsity intercollegiate sports offered by GC and varsity intercollegiate sports not currently offered at GC, and on behalf of all present, prospective, and future female athletes at GC who seek to receive equal treatment and benefits in varsity and club intercollegiate sports at GC;

B.    Enter an order declaring that Defendant has engaged in a past and continuing pattern and practice of discrimination against female students on the basis of sex

89

in the operation of its athletic program, in violation of Title IX and the regulations promulgated thereunder;

C.    Issue an injunction restraining Defendant from continuing to discriminate against female students on the basis of sex, and requiring Defendant to provide females with an equal opportunity to participate in varsity intercollegiate athletics by sponsoring additional women's varsity athletic opportunities based upon the interests and abilities of Defendant's present, prospective, and future students; and requiring Defendant to provide female athletes with equal treatment and benefits in varsity and club intercollegiate athletics;

D.    Issue an injunction restraining Defendant from continuing to discriminate against Coach Danny on the basis of sex and that requires Defendant to continue Coach Danny's employment as a head coach and reinstate him as the women's T&F XC head coach but without discrimination in the terms, conditions, and resources of that employment;

E.    Maintain jurisdiction over this action to monitor Defendant's compliance with the Court's orders;

F.    Award the Plaintiffs compensatory damages and other monetary relief as permitted by law, including punitive damages;

G.    Award Plaintiffs their reasonable attorneys' fees and expenses; and

H.    Order such other and further relief as the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY AS TO ALL ISSUES TRIABLE BY A JURY.**

Dated: October 16, 2017

Respectfully submitted by:

/s/ Robert Ekstrand
_____

Robert Ekstrand
NC Bar No. 26673
Ekstrand & Ekstrand LLP
110 Swift Avenue, Second Floor
Durham, NC 27705
Tel (919) 416-4590
Fax (919) 416-4591
rce@ninthstreetlaw.com

Co-counsel to be admitted *pro hac vice*:

/s/ Felice M. Duffy
_____

Felice M. Duffy
Duffy Law, LLC
770 Chapel Street,
Suite 4F
New Haven CT 06510
Tel.: 203-946-2000
Email: felice@duffylawct.com
Federal Bar No.: ct21379

ATTORNEYS FOR PLAINTIFFS

91